# 13-561

## United States Court of Appeals
## for the Second Circuit

— ◆❚◆ —

ELIJAH TURLEY,

*Plaintiff-Appellee,*

v.

ISG LACKAWANNA, INC., ISG LACKWANNA, LLC, MITTAL STEEL USA
LACKAWANNA INC., LARRY D. SAMPSELL, GERALD C. MARCHAND, THOMAS
JAWORSKI, MITTAL STEEL USA, INC., DBA ARCELOR-MITTAL USA, INC., MITTAL
STEEL USA INC., AKA ARCELORMITTAL STEEL, ARCELOR MITTAL LACKAWANNA,
LLC, FKA ISG LACKAWANNA, LLC,
*Defendants-Appellants*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (SKRETNY, J.)

**FINAL FORM OPENING BRIEF OF DEFENDANTS-APPELLANTS
ISG LACKAWANNA, INC., ISG LACKAWANNA, LLC, MITTAL STEEL
USA LACKAWANNA INC., LARRY D. SAMPSELL, GERALD C.
MARCHAND, THOMAS JAWORSKI, MITTAL STEEL USA, INC., DBA
ARCELOR-MITTAL USA, INC., MITTAL STEEL USA INC., AKA
ARCELORMITTAL STEEL, ARCELOR MITTAL LACKAWANNA, LLC,
FKA ISG LACKAWANNA, LLC**

Lynn A. Kappelman
Dawn Reddy Solowey
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA 02210-2028
Telephone: (617) 946-4888
Facsimile: (617) 946-4801

Evan M. Tager
Miriam R. Nemetz
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

ArcelorMittal Lackwanna LLC, formerly known as ISG Lackawanna LLC and ISG Lackawanna Inc., and incorrectly identified as Mittal Steel USA Lackawanna Inc. (together, "Lackawanna"), is a wholly owned subsidiary of ArcelorMittal USA LLC. ArcelorMittal USA LLC, formerly known as Mittal Steel USA Inc. and ArcelorMittal USA Inc., and incorrectly identified as ArcelorMittal Steel (together, "AMUSA"), is a subsidiary of ArcelorMittal USA Holdings II LLC, which is indirectly owned though a series of intervening holding companies by ArcelorMittal S.A., a publicly held corporation. No other publicly held corporation owns 10% or more of Lackawanna's or AMUSA's stock.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................................v

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE.......................................................................3

STATEMENT OF FACTS ............................................................................5

    1.    Turley's employment and reports of harassment at Lackawanna ........................................................................5

    2.    Lackawanna's response to the harassment ...............................7

    3.    The effects of the harassment on Turley...............................12

    4.    Trial proceedings.................................................................13

        a.    Turley's corporate-liability theory ...............................13

        b.    The damages phase and verdict ....................................14

    5.    The remittitur of punitive damages...........................................15

SUMMARY OF ARGUMENT .......................................................................15

STANDARDS OF REVIEW ...........................................................................18

ARGUMENT ...................................................................................................20

I.    LACKAWANNA AND SAMPSELL ARE ENTITLED TO JUDGMENT ON TURLEY'S IIED CLAIMS ..........................................20

    A.    New York Sets A Strict Standard For IIED Claims..........................21

    B.    The Evidence Does Not Satisfy The Strict Standard For IIED Claims....................................................................................22

        1.    Responding inadequately to harassment is not extreme or outrageous .................................................................22

        2.    There was no affirmative "extreme" or "outrageous" conduct ..................................................................24

II.    AMUSA IS ENTITLED TO JUDGMENT BECAUSE TURLEY DID NOT PROVE THAT AMUSA WAS HIS EMPLOYER.............................25

# TABLE OF CONTENTS
## (continued)

Page

    A.     The Federal Claims ...................................................26

        1.     There was no centralized control of labor relations.................26

        2.     The other factors do not support parent liability ....................30

    B.     New York Law ......................................................31

III.     PREJUDICIAL ERROR IN THE JURY CHARGE AND VERDICT FORM REQUIRES A NEW TRIAL ....................................32

    A.     The Charge And Verdict Form Stated The Wrong Standard............32

    B.     The Error Was Severely Prejudicial....................................34

IV.     THE COMPENSATORY DAMAGES ARE EXCESSIVE ........................36

    A.     The $1,320,000 Award Is Grossly Excessive Given The Absence Of Evidence Of Long-Term Debilitating Distress And The Fact That Turley Was Not Fired From His Job .........................36

        1.     There was no evidence of long-term debilitating distress .......36

        2.     Turley was not discriminatorily fired ......................................38

    B.     The Award Is An Outlier Even Among Cases Awarding Damages For "Significant" Or "Egregious" Distress ........................40

        1.     The award is far out of line with those in other cases involving "significant" distress................................................41

        2.     Even in cases of "egregious" distress, courts have generally awarded less than half the damages awarded here......................................................................................43

        3.     The decision on which the district court principally relied involved a vulnerable child with permanently diminished earning capacity .................................................................45

V.     THE PUNITIVE DAMAGES ARE EXCESSIVE ....................................47

    A.     The Punitive Damages Are Unconstitutionally Excessive ...............47

    B.     The Punitive Damages Are Excessive Under Federal Common Law ...................................................................................57

# TABLE OF CONTENTS
## (continued)

**Page**

C.    The Punishment Is Excessive Given Lackawanna's Financial Condition ............................................................................59

CONCLUSION ....................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abel v. Town Sports Int'l, LLC*,
2012 WL 6720919 (S.D.N.Y. Dec. 19, 2012) ..............................................37, 40

*Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002).......................................................50

*Anderson v. YARP Rest., Inc.,* 1997 WL 27043 (S.D.N.Y. Jan. 23, 1997) .............42

*Bach v. First Union Nat'l Bank*, 486 F.3d 150 (6th Cir. 2007) ...............................54

*Bick v. City of New York*, 1998 WL 190283 (S.D.N.Y. Apr. 21, 1998).................41

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ....................................48, 52, 56

*Boerner v. Brown & Williamson Tobacco Co.*,
394 F.3d 594 (8th Cir. 2005) ...............................................................................55

*Bridgeport Music, Inc. v. Justin Combs Publ'g*,
507 F.3d 470 (6th Cir. 2007) ...............................................................................54

*Brown v. Henderson*, 257 F.3d 246 (2d Cir. 2001) ..................................................34

*Caravantes v. 53rd St. Partners, LLC*,
2012 WL 3631276 (S.D.N.Y. Aug. 23, 2012)......................................................44

*Clark v. Elam Sand & Gravel, Inc.*, 777 N.Y.S.2d 624 (Sup. Ct. 2004)...........24, 25

*Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001)...............................................21

*Consorti v. Armstrong World Indus., Inc.*,
72 F.3d 1003 (2d Cir. 1995) .................................................................................48

*Consorti v. Owens-Corning Fiberglas Corp.*, 518 U.S. 1031 (1996) .....................48

*Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235 (2d Cir. 1995)........................26

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*,
532 U.S. 24 (2001)................................................................................................19

*Dagnello v. Long Island R.R.*, 298 F.2d 797 (2d Cir. 1961) ...................................19

v

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Daniels v. Alvarado*, 2004 WL 502561 (E.D.N.Y. Mar. 12, 2004) ........................22

*DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) ...................................................54, 55

*Duch v. Jakubek*, 588 F.3d 757 (2d Cir. 2009).........................................................33

*Duffy v. Drake Beam Morin,* 1998 WL 252063 (S.D.N.Y. May 19, 1998) ...........29

*EEOC v. Xerxes Corp.*, 639 F.3d 658 (4th Cir. 2011)............................................51

*Ehrlich v. Town of Glastonbury*, 348 F.3d 48 (2d Cir. 2003)..................................18

*Ennis v. Tyco Int'l Ltd.*, 2004 WL 548796 (S.D.N.Y. Mar. 18, 2004)..............29, 31

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) ................................................52

*Fabri v. United Techs. Int'l, Inc.*, 387 F.2d 109 (2d Cir. 2004) ..............................18

*Ferguson v. New Venture Gear, Inc.*,
2009 WL 2823892 (N.D.N.Y. Aug. 31, 2009)..................................................29

*Fid. & Guar. Ins. Underwriters, Inc. v. Jasom Realty Corp.*,
540 F.3d 133 (2d Cir. 2008) ................................................................19

*Gasparini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996)................................. 19

*Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442 (App. Div. 2011)............23

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228 (S.D.N.Y. 1999)....................59

*Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393 (S.D.N.Y. 2008) ................31

*Herman v. Blockbuster Entm't Group*,
18 F. Supp. 2d 304 (S.D.N.Y. 1998) ..........................................................30, 31

*Howell v. New York Post Co.,* 612 N.E.2d 699 (N.Y. 1993)...................................21

*Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187 (10th Cir. 2012) ......................54

*Kauffman v. Maxim Healthcare Servs., Inc.*,
509 F. Supp. 2d 210 (E.D.N.Y. 2007) ........................................................57, 58

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kearney v. Kessler Family LLC*,
2011 WL 2693892 (W.D.N.Y. July 11, 2011) ...................................................27

*Khan v. Hip Cent. Lab. Servs., Inc.*
2008 WL 4283348 (E.D.N.Y. Sept. 17, 2008) ...................................................41

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 111 (2d Cir. 2010) ..............................................................................25

*Kotcher v. Rosa & Sullivan Appliance Ctr.*,
957 F.2d 59 (2d Cir. 1992) ................................................................................33

*Lawson v. New York Billiards Corp.*,
331 F. Supp. 2d 121 (E.D.N.Y. 2004) ...............................................................22

*Leibowitz v. Bank Leumi Trust Co.,*
548 N.Y.S.2d 513 (App. Div. 1989) ...................................................................22

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)........................19, 38, 39, 40

*MacMillan v. Millenium Broadway Hotel*,
83 F. Supp. 2d 546 (S.D.N.Y. 2012) .............................................................37, 58

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997).........................................................60

*McIntyre v. Manhattan Ford*, 682 N.Y.S.2d 167 (App. Div. 1998).................24, 44

*Meacham v. Knolls Atomic Power Lab.*,
381 F.3d 56 (2d Cir. 2004), *vacated and remanded on other grounds*,
544 U.S. 957 (2005)......................................................................................39, 42

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
746 F. Supp. 2d 575 (S.D.N.Y. 2010) ...............................................................54

*Mendez-Matos v. Municipality of Guaynabo*,
557 F.3d 36 (1st Cir. 2009)................................................................................54

*Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392 (S.D.N.Y. 1999) ...............29, 31

*Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999)..................................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Morangelli v. Chemed*, 2013 WL 432571 (E.D.N.Y. Feb. 4, 2013) .......................28

*Morgan v. New York Life Ins. Co.*, 559 F.3d 425 (6th Cir. 2009) ...........................54

*Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544 (S.D.N.Y. 2010) ...................42

*Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996).........................................................26

*In re New York City Transit Auth.*, 581 N.Y.2d 426 (App. Div. 1992)...................44

*In re New York State Div. of Human Rights*,
    934 N.Y.S.2d 628 (App. Div. 2011).................................................................38

*Ortiz-Del Valle v. Nat'l Basketball Ass'n*,
    42 F. Supp. 2d 334 (S.D.N.Y. 1999) ...............................................................58

*Parker v. Columbia Pictures Indus.,* 204 F.3d 326 (2d Cir. 2000) ........................27

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ............................................60

*Payne v. Jones*, 711 F.3d 85 (2d Cir. 2013)........................................................*passim*

*Perdue v. City Univ. of New York,* 13 F. Supp. 2d 326 (E.D.N.Y. 1998) ...............42

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143 (2d Cir. 1997) ..................................18, 33

*Petrosino v. Bell Atl.*, 385 F.3d 210 (2d Cir. 2004)...........................................33, 34

*Rainone v. Potter,* 388 F. Supp. 2d 120 (E.D.N.Y. 2005) .......................................41

*Ramirez v. New York City Off-Track Betting Corp.*,
    112 F.3d 38 (2d Cir. 1997) ..............................................................................43

*Ritter v. Hill 'N Dale Farm, Inc*., 1999 WL 569566 (N.D. Ill. July 28, 1999)
    *aff'd*, 231 F.3d 1039 (7th Cir. 2000)................................................................29

*Robinson v. Towne of Colonie,* 878 F. Supp. 387 (N.D.N.Y. 1995) .......................24

*Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522 (S.D.N.Y. 1998)..........................23

*Ruhling v. Tribune Co.*, 2007 WL 28283 (E.D.N.Y Jan. 3, 2007) ..........................28

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Seepersad v. D.A.O.R. Sec., Inc.*, 1998 WL 474205 (S.D.N.Y. 1998) ....................23

*Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566 (E.D.N.Y. 2011) ................21

*Shea v. Cornell Univ.*, 596 N.Y.S.2d 502 (App. Div. 1993) ...................................23

*Shea v. Icelandair*, 925 F. Supp. 1014 (S.D.N.Y. 1996) ........................................43

*Shukla v. Sharma*,
    2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) .....................................................58

*Snell v. Suffolk Cnty.*, 782 F.2d 1094 (2d Cir. 1986) ..............................................33

*Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F. Supp. 2d 477 (S.D.N.Y. 1999) .................23

*Stallings v. U.S. Elecs., Inc.*, 707 N.Y.S.2d 9 (App. Div. 2000) .............................23

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ...................................................................................*passim*

*Stuto v. Fleishman,* 164 F.3d 820 (2d Cir. 1999) .............................................21, 22

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013) .....................................33, 35

*Thomas v. Istar Fin., Inc.*, 508 F. Supp. 2d 252 (S.D.N.Y. 2007) .........53, 57, 58, 59

*Thomas v. Istar Fin., Inc.*, 652 F.3d 141 (2d Cir. 2011) .........................................53

*In re Town of Hempstead*, 649 N.Y.S. 2d 942 (App. Div. 1996) ...........................44

*Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) .......................................26

*Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274 (S.D.N.Y. 2008) .................57, 58

*Turley v. ISG Lackawanna, Inc.*,
    __ F. Supp. 2d __, 2013 WL 150382 (W.D.N.Y. Jan, 14, 2013) .........................4

*Vasbinder v. Scott*, 976 F.2d 118 (2d Cir. 1992) ....................................................60

*Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243 (S.D.N.Y. 2007) ...................29, 31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Watson v. E.S. Sutton, Inc.*,
  2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), *aff'd*, 225 F. App'x 3 (2d
  Cir. 2006) ...............................................................................................................58

*Watson v. E.S. Sutton, Inc.*, 225 F. App'x 3 (2d Cir. 2006)....................................59

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) ...............................................25

*Welch v. UPS, Inc.*,
  871 F. Supp. 2d 164 (E.D.N.Y. 2012) ................................................................44

*Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004).......................55, 56

*Woodell v. United Way of Dutchess Cnty.*,
  357 F. Supp. 2d 761 (S.D.N.Y. 2005) .....................................................27, 29, 30

*Zakre v. Norddeutsche Landesbank Girozentrale*,
  344 F. App'x 628 (2d Cir. 2009) ...................................................................54, 59

*Zakre v. Norddeutsche Landesbank Girozentrale*,
  541 F. Supp. 2d 555 (S.D.N.Y. 2008) ..........................................................56, 58

*Zeno v. Pine Plains Central Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ..............45, 46

## STATUTES

15 U.S.C. §§ 1681 *et seq.*...........................................................................................25

28 U.S.C. § 1291 .....................................................................................................1, 3

28 U.S.C. § 1331 .........................................................................................................1

28 U.S.C. § 1332 .........................................................................................................1

28 U.S.C. § 1367(a) .....................................................................................................1

42 U.S.C. § 1981 ...................................................................................................1, 32

42 U.S.C. § 1981a(b)(3)............................................................................................57

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

42 U.S.C. §§ 2000e *et seq.* ............................................................. 1

N.Y. C.P.L.R. § 5501(c) ................................................................ 19

N.Y. Exec. Law § 297(4)(c)(vi) ..................................................... 57

## OTHER AUTHORITIES

3C KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS
  § 171.22 (5th ed. 2012) ........................................................... 34

CASS R. SUNSTEIN ET AL., PUNITIVE DAMAGES:
  HOW JURIES DECIDE (2003) ..................................................... 48

## JURISDICTIONAL STATEMENT

Plaintiff Elijah Turley ("Turley") sued his employer Lackawanna, its parent AMUSA, and three individual defendants, raising claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981; and New York law. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367(a).

The district court entered judgment on the jury's verdict on June 15, 2012. SPA1. On July 12, 2012, defendants moved for judgment as a matter of law ("JMOL"), a new trial, and/or remittitur. Dkt. 214. On January 14, 2013, the district court largely denied the motion, but ordered a partial new trial unless Turley accepted a remittitur of the punitive damages. SPA2-50. On February 5, 2013, the district court entered an amended judgment reflecting Turley's acceptance of the remittitur. SPA51. Defendants appealed on February 12, 2013 (SPA52), and amended their notice of appeal on February 20, 2013 (SPA55). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Turley, who is African-American, alleged that he was the target of race-based harassment by co-workers. He sued Lackawanna, AMUSA, and Lackawanna employees Larry Sampsell, Gerald Marchand, and Thomas Jaworski, contending that they failed to do enough to stop the harassment. The jury found all

1

defendants liable for creating a hostile work environment in violation of federal and state anti-discrimination laws, and found Lackawanna and Sampsell liable for intentional infliction of emotional distress ("IIED").  The jury awarded Turley compensatory damages totaling $1,320,000 and punitive damages exceeding $24,000,000.  The district court ordered a new trial unless Turley agreed to remit the punitive damages to $5,000,000, which Turley did.  This appeal presents the following issues:

1.     Whether the conduct of Lackawanna and Sampsell was sufficiently extreme and outrageous to satisfy the elements of the IIED tort.

2.     Whether the evidence was sufficient to support the jury's finding that AMUSA was Turley's employer for purposes of holding it liable on Turley's hostile-environment claims.

3.     Whether the district court erred in instructing the jury that it could impose liability on AMUSA and Lackawanna for creating a hostile environment if "a supervisor," rather than the company as a whole, failed to take reasonable action to address Turley's complaints of harassment by co-workers.

4.     Whether $1,320,000 is excessive compensation for Turley's emotional distress.

5.     Whether the punitive awards, which total $5,000,000, are excessive.

## STATEMENT OF THE CASE

On December 15, 2005, Turley filed a charge of discrimination against Lackawanna with the Equal Employment Opportunity Commission ("EEOC"), alleging disparate treatment with respect to overtime, attendance policies, and restricted-duty policies. A52. On March 16, 2006, Turley filed a second charge alleging that he had been denied opportunities for training and promotion; he later amended that charge to name AMUSA as a defendant. A55. The EEOC issued a right-to-sue letter on December 1, 2006.

On December 6, 2006, Turley sued defendants in the U.S. District Court for the Western District of New York, alleging discrimination, retaliation, and IIED. A27. On December 21, 2007, Turley filed a new EEOC charge alleging harassment and retaliation. A51. After the EEOC issued a right-to-sue letter, Turley filed another complaint. A39. The district court consolidated the actions. Dkt. 21.

Defendants moved for summary judgment. Dkt. 27. The district court granted the motion in part, dismissing Turley's retaliation claim and most of his disparate-treatment claims. A77. The district court conducted a jury trial on Turley's remaining claims: hostile-environment claims under three statutes, an unequal-pay claim, and an IIED claim. The trial proceeded in two phases, the first addressing liability for the various claims and the second addressing compensatory

damages, liability for punitive damages, and amount of punitive damages.  At the close of plaintiff's evidence in Phase I, the district court granted defendants' JMOL as to Turley's unequal-pay claim but denied JMOL as to the other claims.  A145.

The jury found against all defendants on the hostile-environment claims and against Lackawanna and Sampsell on the IIED claim.  A1678.  AMUSA was not deemed liable on the IIED claim because the jury found that the applicable standard for imposing parent-company liability had not been satisfied.  A1689.  In the second phase, for the hostile-environment claims, the jury awarded $1,000,000 in compensatory damages and $20,000,000 in punitive damages against the corporate defendants and $60,000 in compensatory damages against the individual defendants.    A1691.    On the IIED claim, the jury awarded $250,000 in compensatory damages and $4,000,000 in punitive damages against Lackawanna, and $10,000 in compensatory damages and $5,000 in punitive damages against Sampsell.  *Id.*

The district court (Skretny, C.J.) denied defendants' post-trial motion for JMOL and new trial in large part, but ordered a new trial on punitive damages unless Turley accepted a remittitur of the punitive damages to $4,000,000 on the hostile-environment claims and $1,000,000 on the IIED claims ($998,750 against Lackawanna and $1,250 against Sampsell).  *Turley v. ISG Lackawanna, Inc*., __ F. Supp. 2d __, 2013 WL 150382, at *24 (W.D.N.Y. Jan, 14, 2013); SPA49-50.  It

4

also awarded attorneys' fees and costs of $470,034.72. Turley accepted the remittitur.

## STATEMENT OF FACTS

### 1. Turley's employment and reports of harassment at Lackawanna.

Turley began working at the Lackawanna steel plant in January 1995. A275. He worked in the pickler department (the "Pickler") from 1997 (A276) until the plant closed in April 2009 (SPA6).[1] Turley initially found his workplace to be a "pleasant environment" that was "[v]ery friendly" and "like a family." A277. Contrary to the district court's statement that Turley was the "lone African-American in the Pickler" (SPA26), three other African-American men—Roy Cofield, Ronnie Drayton, and Eric Smith—worked in the Pickler at various times. A227, A485, A511, A832.

According to Turley, his work environment deteriorated late in 2005, after he filed a grievance alleging that Jaworski, the Pickler area manager (A480), favored white employees with respect to overtime opportunities and other matters (A278-82). Turley testified that Jaworski responded disrespectfully to Turley's complaints and addressed him and another African-American worker as "boys." A285-87.

---

[1] In the Pickler, large steel coils were processed through an acid bath to remove impurities. A171-72, A237-38.

5

Turley also alleged that, beginning in late December 2005, his co-workers engaged in various acts of racial harassment. First, offensive graffiti began appearing around the plant, including near Turley's work station. The graffiti included the phrase "dancing gorilla" (A289-91); "King King lives" and "KK" (A295); "KKK" (which allegedly appeared twice) (A327, A343-44); an eyeball (A340), a "sad face with teardrops" (A309, A311); "no lazy people" (A316); "your wife sucks" and "your daughter sucks" (A369); and a drawing of "an ape man or something referring to an Afro American man" (A371).

Second, certain co-workers, including Frank Pelc, allegedly addressed Turley using racial slurs. A310, A356. In addition, Turley heard racist remarks, monkey sounds, a threat, and insults to his attorney over the plant's "Femco" communication system. A347-48, A354-55.

Third, Turley had two confrontations with Pelc. Turley asserted that Pelc accused him of vandalizing Pelc's car and then "threatened his life" and used profanity and racial slurs. A308, A406-08. Turley and Pelc also sparred over Turley's allegation that Pelc had intentionally created additional work for Turley by running the steel coil backward instead of forward so that it fell off the processor roll. A332-33. Turley complained to management and was ultimately disciplined for making a veiled threat against Pelc during this incident. A333. In addition, Turley testified that Pelc broke a chair he was using—saying 'That n-----

ain't sitting in this chair'" (A376)—but admitted that he was not present when this supposedly occurred (A423-25).

Fourth, Turley reported damage to his personal property and interference with his work station. Four of Turley's vehicles were scratched or otherwise vandalized (A361-62), and Turley once found a monkey with a noose around its neck hanging from his car mirror (A363-64). Turley once found the chair he used covered with thick black grease (A319), and he often found grease on the controls or the door of the processor booth (A320-21).

Finally, Turley testified that white workers would not relieve him for a bathroom break (A373-74) and that his name was sometimes scratched off time sheets (A375).

### 2. Lackawanna's response to the harassment.

Lackawanna faced significant obstacles to rooting out and punishing the harassment. Undisputed evidence showed that the company's investigative efforts were stymied by both a "code of silence" among union members (A199-201) and the employees' (including Turley's) practice of warning one another when a supervisor entered the Pickler (A506, A614-15, A721). Five witnesses—including Turley—admitted that they had either withheld relevant information or lied during the company's investigations. *See*, *e.g.*, A191-92, A194-200, A399-400, A621, A711-13, A721-22. Although union rules limited Lackawanna's ability to

discipline employees (*see* A201-02, A640-41, A642-43), Lackawanna took many steps to uncover and stop the harassment, and it imposed discipline when it could confirm inappropriate conduct. *See, e.g.*, A233-35 (Daniel Ruger was suspended for five days without pay after he stated that he did not want to work with Turley because of his race).

For example, Lackawanna responded decisively to Turley's first reports of offensive graffiti. After Turley found the "dancing gorilla" sign, he alerted the shift manager, who immediately removed the sign. A289-91, A188, A572. Several days later, Turley found the words "King Kong lives" and the initials "KK" written in the processor booth. A295. He reported the incident to Larry Sampsell (A300), who was responsible for administering the collective bargaining agreement and overseeing the security firm that controlled access to the plant (A515-16). Although the graffiti did not initially strike Sampsell as racist (A528-34), other managers deemed it highly inappropriate (A490-91, A833-34). They shut down the production line and held meetings with the two Pickler crews in order to discuss the two incidents. A400-05, A440, A491, A755-56, A834-35.

Jaworski conducted the meeting along with Sampsell and Marchand, who was Lackawanna's manager of human resources. A491. They reminded the workers of the company's policy against harassment and stated that the graffiti could be considered racist and would not be tolerated. A403, A440, A491, A507,

A603, A620, A834-35, A718, A755-56.  After Pelc confessed to writing the
graffiti (A835-36)—insisting that it had been directed at a white co-worker (*id.*;
A757-61)—Lackawanna suspended him without pay for three days (A535-36,
A573-74, A715).

Primarily under the leadership of Marchand and his successor, Human
Resources Manager Nevin Hope, Lackawanna also responded to the other
incidents that Turley reported.  When Turley reported that Pelc had threatened him
and uttered racial slurs, for example, Marchand and Sampsell immediately
investigated the incident by interviewing Turley and other employees.  A407-08,
A578-79, A762-64, A837, A1159.  Investigators were unable to corroborate
Turley's assertion that Pelc had used racial slurs (A578-79), but Lackwanna
suspended Pelc without pay for two days after he admitted having told Turley that
he would "deal with [him] on the outside" (A408, A579, A763).

When the letters KKK appeared in the plant, Marchand interviewed all
employees who might have information ***three times*** in an effort to identify the
perpetrator.  A508-10, A580-85, A846-48, A1164, A1171.  Management also
diligently investigated Turley's reports that he heard threats and monkey sounds on
the plant communications system.  A779-80, A887-91, A893-95, A1193, A1258-
75, A1276-79, A1305.  When Turley reported finding a tennis ball that emitted
animal sounds, Hope and two supervisors conducted a sweep of the Pickler in an

effort to find and remove any additional tennis balls. A887-88. Sampsell later arranged to record all future radio transmissions. A791-93, A1104. He also arranged for Turley to be escorted to and from the parking lot and emphasized to supervisors the importance of ensuring Turley's safety. A781-85, A787-90; A1103, A1104.

After Turley reported finding the toy monkey tied to his car, Sampsell and Hope interviewed every employee in the Pickler, and Sampsell reviewed a video recording of the parking lot. A775-78, A876-85, A1173-90. The company also retained an attorney to conduct an independent probe of the matter; he interviewed fifteen employees and reviewed surveillance tapes, but was unable to identify the perpetrator. A694-700. In addition, Sampsell ordered lights installed in the parking lot at a cost of approximately $15,000. A778-79.

Lackawanna also investigated numerous other complaints by Turley. *See, e.g.*, A733-34 (Marchand and Jaworski investigated Turley's complaint that co-workers would not relieve him from his post for bathroom breaks); A751-54 (Sampsell investigated Turley's complaint about vandalism to his car); A848-49, A1169 (Marchand investigated Turley's complaint that Pelc deliberately backed a coil out of the shear); A587-90, A837-39, A1160 (Marchand and shift manager investigated complaint of grease on Turley's chair); A843-44, A1166 (Marchand investigated Turley's complaint that his name was crossed off timesheets); A722,

10

A844-46, A1162, A1167, A1280, A1301 (Marchand and Hope each investigated complaints about graffiti); A886-87, A1191 (Hope investigated report that Pelc purposely damaged Turley's chair).

In response to Turley's complaints, Marchand, Jaworski, Sampsell, and the shift managers all stepped up their monitoring of the Pickler. A746-47, A766-67, A840-42. The increased management presence was so robust that employees complained to the union president about being continuously monitored. A644-46, A647. Sampsell had two cameras installed in the Pickler (A596-98, A768-71)—capturing the processor booth and thirty feet on either side of it (A599-600)—but Lackawanna removed them after Turley and other employees complained about them (A650, A771-72). Sampsell even hired a private investigator to work undercover in the Pickler (A772-75), but employees promptly became suspicious (*id.*).

Lackawanna also continuously reminded employees of its anti-discrimination and anti-harassment policies. These policies were conspicuously posted throughout the plant. A441-42, A487, A494, A510, A649, A748-49, A813-23, A1105, A1106, A1124, A1125. The Plant Rules and Regulations, which prohibited harassment, were mailed to employees' homes annually. A636-39, A824-31, A1109-23. Marchand and his successor Hope repeatedly met with employees in the Pickler, both individually and in groups, reiterating the plant's

11

policies and stating that harassment and retaliation would not be tolerated. A851-52, A882-84, A891-93. In October 2007, Lackawanna and the union jointly conducted a two-hour harassment training session that was attended by all of the plant's approximately 270 employees. A494, A570-71, A906-09, A1194.

### 3. The effects of the harassment on Turley.

Turley reported that, as a result of the harassment, he experienced anxiety and depression, cried frequently, suffered eating and sleeping disruptions, and lost interest in socializing and sexual activity. *See*, *e.g.*, A384-85, A387-88, A395-96, A428, A429-32. Turley experienced several panic attacks that required medical attention (A380-84), and his weight fell from 250 to 214 pounds (A388).

Plaintiff's treating psychologist, Dr. Pino, who saw him seven times between March and October of 2006, diagnosed him with panic disorder and adjustment disorder with depression. A209-12, A216-17, A218-19. Turley's treating psychiatrist, Dr. Jaffri, who saw Turley three times in a two-month span in 2008 (A686-87), diagnosed Turley with panic disorder, post-traumatic stress disorder ("PTSD"), and adjustment disorder with depressed mood and anxiety/panics. A677-78. Turley's doctors prescribed anxiety and depression medications, which he took for about two years. A212-13, A390-91, A674, A680-82. Turley has been prescribed no medicine since November 2008. A687. Once the plant closed in March 2009, Turley improved and no longer needed psychiatric treatment. A393-

94. When he met Dr. Jaffri during trial—after not seeing him for 3½ years—Turley was receiving no psychiatric services or therapy, and had developed coping mechanisms. A688-89.

### 4. Trial proceedings.

#### a. Turley's corporate-liability theory.

Turley's principal theory was that Lackawanna supervisors did too little to address the racially hostile work environment created by his co-workers. *See, e.g.*, SPA21-23. To support that theory, Turley's counsel repeatedly asked Jaworski and Sampsell whether they personally had responded to a particular incident (*e.g.*, A488-89, A493, A525-26, A550, A552); sometimes, they had not responded personally, but others at Lackawanna had done so in their stead (*e.g.*, *id.*, A508-10, A580-81, A584-85, A846-48).

At the close of Phase I, the Court instructed the jury that the corporate defendants would be liable for a hostile environment created by co-workers if "the plaintiff's supervisor or successively higher authority knew … or should have known … of the hostile … work environment and permitted it to continue by failing to take remedial action." A937-38. Question 2 on the Phase I verdict form similarly asked whether "a supervisor" had "created or permitted the hostile or abusive work environment by not taking reasonable action to address it." A1679. Defendants objected on the basis that the corporate defendants could be held liable

13

only if ***the company as a whole***—not a single supervisor—had failed to take sufficient action. A948-49. The district court overruled the objection (A949), and the jury found against the corporate defendants on Turley's hostile-environment claims.

### b.    The damages phase and verdict.

Turley introduced two categories of evidence during the damages phase. First, over defendants' objections, the district court admitted a U.S. Census Bureau life-expectancy table. A983-85. Although Turley had introduced no evidence that his emotional injuries were permanent, the court advised jurors that Turley "is expected to live for another 30.1 years as per the table" and invited them to consider this fact "in assessing damages in this case." A987. Second, Turley introduced evidence regarding AMUSA's and Lackawanna's financial conditions. A953-75. Turley's counsel acknowledged that Lackawanna "is no longer functioning and has limited assets," but stressed that AMUSA "is one of the largest steel manufacturers with plants across the United States" and "sales in the billions." A951.

Emphasizing that Turley was expected to live for another thirty years (A989), Turley's counsel then requested between $2,000,000 and $3,000,000 in compensatory damages, arguing that $1,000,000 would be "too little." A989-90. He also sought punitive damages equal to a percentage of AMUSA's sales or net

worth, arguing that "an award of punitive damages of two shifts of [AM USA's] revenue … equates to 22 million" and that "[f]our percent" of AMUSA's net worth "brings us to 24 million."  A991-92.  The jury awarded Turley $1,320,000 in compensatory damages and approximately $24,000,000 in punitive damages.

### 5.  The remittitur of punitive damages.

The district court denied defendants' post-trial motion in large part, but held that the punitive damages were "excessive and should be set aside."  SPA38.  The court noted that "[d]efendants did not, for the most part, perpetrate the racist acts; instead, they failed to remedy them or acquiesced in them."  SPA40.  It ordered a new trial unless Turley agreed to remit the punitive damages to $5,000,000— nearly four times the compensatory damages.  SPA44.  Turley accepted the remittitur.

## SUMMARY OF ARGUMENT

No one can deny that Turley was subjected to serial acts of harassment.  The central questions here, however, are whether defendants properly were held liable for that harassment and, if so, whether the amounts awarded to compensate Turley and to punish defendants are excessive.  As we show below, the liability findings against some or all of the defendants are unsustainable for various reasons.  Moreover, even if those findings are sustainable, the awards of compensatory and punitive damages are not.

15

1.     Lackawanna and Sampsell are entitled to judgment on Turley's IIED claim because Turley did not—and could not—establish the elements of that tort. Under New York law, Turley was required to prove that defendants' conduct was "extreme and outrageous"—meaning that it went beyond all possible bounds of decency and is utterly intolerable in a civilized community.  The district court posited that evidence that Sampsell did not respond adequately to the harassment justified the verdict, but under New York law such passive failure to do more to rectify the situation does not rise to the level of "extreme and outrageous" conduct. Sampsell's supposed affirmative misconduct—videotaping Turley's work station and ordering a background check—similarly fails to meet the standard necessary to impose liability for IIED.

2.     AMUSA is entitled to judgment on Turley's hostile-environment claim because the evidence was insufficient to show that AMUSA was Turley's employer.  Turley sought to hold AMUSA jointly liable on the theory that it and Lackawanna were a single employer.  But Turley did not prove that AMUSA exercised control over employment decisions at Lackawanna, that AMUSA and Lackawanna had interrelated operations, or that AMUSA's corporate officers participated in employment decisions affecting Turley.  The facts cited by the district court—for example, that AMUSA was a party to a collective bargaining agreement that covered Turley and that it provided a centralized benefit system and

legal department—are insufficient to override the presumption that a parent is not responsible for its subsidiary's acts.

3.      The jury charge and verdict form erroneously stated that an employer is liable for co-worker harassment if *a supervisor*—as opposed to *the employer as a whole*—failed to take reasonable action to address the harassment.  This highly prejudicial error necessitates a new trial on Turley's hostile-environment claim against the corporate defendants.

4.      The $1,320,000 emotional-distress award is excessive and should be reduced.  Turley did not introduce evidence that he would suffer long-term debilitating distress and was not discriminatorily fired.  Other plaintiffs who, like Turley, have suffered "significant" emotional distress and were not fired have typically received a fraction of the amount awarded to Turley.  But even in comparison to cases involving plaintiffs who suffered "egregious" distress, the award here is off the charts.

5.      The Supreme Court's three guideposts demonstrate that $5,000,000 is unconstitutionally excessive punishment.  First, defendants' alleged conduct— failing to take more effective measures to prevent harassment by non-supervisory employees—was at the very low end of the reprehensibility spectrum.  Second, the nearly 4:1 ratio of punitive to compensatory damages is excessive given the magnitude of the compensatory damages; if the immense compensatory award is

not reduced, then a ratio of less than 1:1 would be the constitutional maximum. Third, a $5,000,000 sanction is disproportionate to amounts deemed appropriate by Congress and the New York State legislature for comparable conduct.

A review of punitive awards upheld in other employment cases confirms that $5,000,000 is excessive punishment under federal common law. Awards between $50,000 and $300,000 are typical in such cases, and awards above $1,000,000 are regularly reduced to six figures or less. A $5,000,000 exaction would exceed by a wide margin the largest awards previously approved in this Circuit.

The $998,750 punitive award against Lackawanna for Turley's IIED claim is excessive for an additional reason: It would consume most of Lackawanna's net worth.

## STANDARDS OF REVIEW

The denial of a motion for JMOL is reviewed *de novo*. *Fabri v. United Techs. Int'l, Inc.*, 387 F.2d 109, 119 (2d Cir. 2004). Judgment should be granted "when, viewing the evidence in the light most favorable to the non-moving party, there can be but one conclusion as to the verdict that reasonable persons could have reached." *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir. 2003).

A claim of instructional error is reviewed *de novo* (*Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997)); if "the error was prejudicial in light of the charge as a whole," the Court "will reverse" (*id.*). An instruction "is erroneous if it

misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* Although the wording of a verdict form is reviewed for abuse of discretion, when such wording "mislead[s] and confuse[s] the jury or … inaccurately frame[s] the issues to be resolved," the Court will reverse. *Fid. & Guar. Ins. Underwriters, Inc. v. Jasom Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008).

A district court's decision whether to order a remittitur of compensatory damages is reviewed for abuse of discretion, "taking into account amounts awarded in other, comparable cases." *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012). Although this Court "'give[s] the benefit of every doubt'" to the trial court's judgment, there is "'an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.'" *Gasparini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996) (quoting *Dagnello v. Long Island R.R.*, 298 F.2d 797, 806 (2d Cir. 1961)). As to federal claims, an award so high as to "shock the judicial conscience and constitute a denial of justice" will be set aside. *Lore*, 670 F.3d at 177. "Under New York law … an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'" *Id.* (quoting N.Y.C.P.L.R. § 5501(c)).

The constitutionality of an award of punitive damages is reviewed *de novo. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 24, 436 (2001). A

19

district court's decision evaluating a punitive award for excessiveness under the common law is reviewed for abuse of discretion, but "the degree of discretion enjoyed by trial courts in these matters is relatively narrow." *Payne v. Jones*, 711 F.3d 85, 98, 100 (2d Cir. 2013).

## ARGUMENT

## I. LACKAWANNA AND SAMPSELL ARE ENTITLED TO JUDGMENT ON TURLEY'S IIED CLAIMS.

The district court recognized that the "principal charge levied at Defendants" was the "failure to take appropriate remedial action" (SPA24); it also acknowledged that "a supervisor's inaction, or inadequate action, is rarely considered sufficient to sustain an [IIED] claim" (SPA26). Nevertheless, the court upheld the jury's verdict against Lackawanna and Sampsell on Turley's IIED claim largely on the ground that Sampsell's failure to respond adequately to the harassment could be deemed extreme and outrageous.[2] In fact, the conduct of these two defendants was not extreme and outrageous as a matter of law, and the judgment for Turley on the IIED claim should be reversed.

---

[2]  Because the jury found Jaworski and Marchand not liable for IIED, the district court appropriately looked only to Sampsell's conduct in considering whether Lackawanna could be held liable. SPA24. Although the court recognized that harassment generally cannot be imputed to an employer because it falls outside the scope of employment, it held that Sampsell's supposed failure to take adequate remedial measures might reasonably be viewed as having been intended to "protect [Lackawanna's] bottom line" (SPA25-26) and thus to fall within the scope of his employment.

20

## A.    New York Sets A Strict Standard For IIED Claims.

The standards for stating a valid IIED claim under New York law are "'rigorous, and difficult to satisfy.'"  *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001).  Indeed, this "'highly disfavored cause of action is almost never successful.'"  *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 586 (E.D.N.Y. 2011).  An IIED claim requires proof of  "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress."  *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir. 1999).

Whether the plaintiff has satisfied the "stringent" standard for extreme and outrageous conduct is an issue of law for the court.  *Stuto,* 164 F.3d at 827-28. IIED liability attaches only when the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and be "regarded as atrocious, and utterly intolerable in a civilized community."  *Howell v. New York Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1993).  "It has not been enough that the defendant has acted with an intent which is tortious, or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  *Stuto*, 164 F.3d at 827.

Courts are especially reluctant to allow IIED claims in employment-discrimination cases. *Semper,* 786 F. Supp. 2d at 587. Acts that "merely constitute harassment," "hostile environment," intimidation, insults, or other indignities "fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." *Id.* Even racist slurs are insufficiently egregious. *See, e.g., Lawson v. New York Billiards Corp.*, 331 F. Supp. 2d 121, 133 (E.D.N.Y. 2004) (racist remarks, threats, and conspiracy to have plaintiff arrested were not sufficiently outrageous); *Daniels v. Alvarado*, 2004 WL 502561, at *6 (E.D.N.Y. Mar. 12, 2004) ("stupid n****r" slur was not sufficiently outrageous); *Leibowitz v. Bank Leumi Trust Co.,* 548 N.Y.S.2d 513, 521 (App. Div. 1989) ("reprehensible" harassment including repeatedly calling plaintiff "Hebe" and "kike," telling her to choose between health and job, and instructing co-workers not to talk to her was not sufficiently outrageous).

**B.** **The Evidence Does Not Satisfy The Strict Standard For IIED Claims.**

**1.** **Responding inadequately to harassment is not extreme or outrageous.**

According to the district court, the jury could have deemed Sampsell's inaction to have been "'beyond the bounds of decency'" if it concluded that he did not "hold perpetrators" "sufficiently responsible" (SPA26); did not keep Pelc "away from Turley at the plant" (SPA9, 21, 26); was "uncooperative" with a

22

detective (SPA22, 26); and reacted to certain incidents as "horseplay" (SPA22-23, 26). That reasoning is irreconcilable with settled New York law.

For decades, courts have consistently held that an inadequate response to harassment is ***not*** extreme and outrageous for these purposes. *See Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 445 (App. Div. 2011) (employer's "mere inaction" in response to complaints of vandalizing property, menacing phone calls and physical threats, is not "extreme and outrageous"); *Stallings v. U.S. Elecs., Inc.*, 707 N.Y.S.2d 9, 10 (App. Div. 2000) (allegation "that the employer refused to take any steps to curtail … harassment" was insufficient); *Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F. Supp. 2d 477, 492 (S.D.N.Y. 1999) ("fail[ure] to adequately respond" to harassment "is not sufficient to meet the high threshold of extreme and outrageous conduct"); *Seepersad v. D.A.O.R. Sec., Inc.*, 1998 WL 474205, at *7 (S.D.N.Y. Aug. 12, 1998) (Sotomayor, J.) ("Responding in an unreasonably slow manner to complaints of harassment is wrong, even reprehensible. But it is not, as a matter of law, sufficiently shocking behavior to sustain a claim for [IIED] under the strict New York standard."); *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 532 (S.D.N.Y. 1998) (supervisor's failure to intercede against egregious sexual harassment, and instruction that plaintiff keep silent, are "not so outrageous and extreme to satisfy the very strict standard New York courts have set" for IIED); *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 504

23

(App. Div. 1993) (allegations that "defendants permitted crude and offensive statements of a sexually derisive nature to occur in the workplace and, in effect, participated therein," do not "rise to the level of an atrocity"). This Court should do the same here.

Indeed, to permit an IIED claim based on inaction would significantly expand this disfavored tort. There is no justification for doing so, particularly given that Turley's statutory claims provide an adequate remedy. *McIntyre v. Manhattan Ford*, 682 N.Y.S.2d 167, 169 (App. Div. 1998) (IIED claim is "only … a last resort" when other tort or statutory recovery is unavailable).

### 2. There was no affirmative "extreme" or "outrageous" conduct.

The district court opined that Sampsell's role was "not limited to mere acquiescence," noting that Sampsell installed a camera directed at Turley's workstation and ordered a background check on him. SPA26. Neither action constitutes extreme and outrageous conduct. *See Clark v. Elam Sand & Gravel, Inc.,* 777 N.Y.S.2d 624, 625-26 (Sup. Ct. 2004) (conducting "video and telephone surveillance in the workplace without the plaintiff's knowledge" was not "sufficiently outrageous"); *Robinson v. Towne of Colonie,* 878 F. Supp. 387, 409 (N.D.N.Y. 1995) (ordering "criminal background check" on plaintiffs was not "so egregious as to be beyond all bounds of decency").

Because there "simply is no … right in New York" to privacy in the workplace (*Clark,* 777 N.Y.S.2d at 626), the camera surveillance was lawful; moreover, it was discontinued immediately after Turley objected (A339). Background checks also are lawful (*see* Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*) and are common in the workplace (A587). Furthermore, there is no evidence that Turley knew of the background check during his employment. Accordingly, neither action reasonably can be described as an "atrocity." Because the evidence thus does not support Turley's IIED claim, the judgment on that claim must be reversed.

## II.   AMUSA IS ENTITLED TO JUDGMENT BECAUSE TURLEY DID NOT PROVE THAT AMUSA WAS HIS EMPLOYER.

The parties stipulated that ***Lackawanna***, AMUSA's subsidiary, was Turley's employer. A142. As the district court recognized, "'a parent corporation … is not liable for the acts of its subsidiary.'" SPA14 (quoting *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 43 (2007)); *see also Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 194 (2d Cir. 2010), *aff'd*, 133 S. Ct. 1659 (2013). Yet the court denied AMUSA's JMOL, holding that the evidence was sufficient to prove that AMUSA and Lackawanna were a "single employer." SPA14, 18-19. The district court erred in so holding.

## A.    The Federal Claims.

"[E]mployees of a corporate entity" are treated "as the employees of a related entity" only "under extraordinary circumstances." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  A plaintiff seeking to hold his employer's parent liable under Title VII and Section 1981 for the employer-subsidiary's acts must prove that the parent and subsidiary are a "single employer." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995).  Single-employer status depends on "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* at 1240.  Under this test, AMUSA and Lackawanna were not a single employer.

### 1.    There was no centralized control of labor relations.

Centralized control of labor relations "is the most significant" factor. SPA15; *see also Cook*, 69 F.3d at 1241; *Murray*, 74 F.3d at 404.  For this factor, the critical question is "'[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Cook*, 69 F.3d at 1240 (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)).  To be deemed a single employer, the parent must have "had actual day-to-day control over the [subsidiary's] employment decisions," and "with respect to plaintiff's employment specifically," such as involvement in hiring, supervising,

26

and disciplining the plaintiff. *Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 769 (S.D.N.Y. 2005); *see also Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 341 (2d Cir. 2000) (requiring centralization of "tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions"); *Kearney v. Kessler Family LLC*, 2011 WL 2693892, at *5 (W.D.N.Y. July 11, 2011) (requiring involvement in hiring, firing, disciplining, and supervising).

Turley failed to prove that AMUSA exercised day-to-day control over employment decisions at Lackawanna generally, or regarding him specifically. He introduced ***no*** evidence that AMUSA was involved in hiring, firing, supervising, or disciplining him or other similarly situated employees. Instead, the evidence showed that ***Lackawanna's*** managers alone made these decisions, including "administrating, coordinating, managing, ***doing the hands-on work of all the human resource functions that existed at the … plant,***" handling union grievances and imposing discipline. A515-17, A562-67, A568 (emphasis added). Lackawanna's managers investigated Turley's complaints, imposed remedial measures and discipline, and publicized and enforced employment policies.

In holding that there was sufficient evidence of centralized control of labor relations, the district court cited evidence that AMUSA was a party to the collective bargaining agreement, maintained EEO policies, was involved with a

27

2007 harassment training conducted at the plant, provided a "centralized benefit system" (SPA16), and maintained an Alertline for reporting misconduct.  It also noted that Hope distributed the EEO policies of both Lackawanna and AMUSA during one investigation, that he typed his report on AMUSA letterhead, and that Sampsell once told police that he would consult with AMUSA's legal department before providing information.  SPA15-16.

Even putting aside the discrepancies between these observations and the actual evidence,[3] these facts do not establish centralized control over labor relations.  *See, e.g., Morangelli v. Chemed*, 2013 WL 432571, at *4-5 (E.D.N.Y. Feb. 4, 2013) (no centralized control where parent did "not hire, terminate or discipline" subsidiary's employees, despite sharing of high-level managers, benefit plans, and office building, and requirement that subsidiary's employees abide by certain of parent's policies); *Ruhling v. Tribune Co.*, 2007 WL 28283, at *6 (E.D.N.Y Jan. 3, 2007) (no centralized control where parent did not make final employment decisions, despite involvement by parent's legal counsel and HR with plaintiff, and training for subsidiary's employees that featured parent's CEO and

---

[3]   For example, Hope's interview reports were not on "AMUSA letterhead"; they merely displayed the "ArcelorMittal" logo.  A1174.  AMUSA did not "provide" the October 2007 training, which was presented "by representatives from the international union."  SPA15, A906-07.  The Alertline was not "centralized" (SPA16), but was operated by third party Global Compliance; AMUSA's role was limited to forwarding complaints to Lackawanna for its response.  *See, e.g.,* A592, A868.

directed harassment complaints to parent's HR personnel); *Ferguson v. New Venture Gear, Inc.*, 2009 WL 2823892, at *3-4 (N.D.N.Y. Aug. 31, 2009) (no centralized control despite parent's status as party to CBA, where subsidiary handled personnel matters); *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 252 (S.D.N.Y. 2007) (common benefits plans reflect only "'economies of scale,'" not centralized control, which requires evidence of "'joint hiring and firing decisions'" or the like); *Woodell*, 357 F. Supp. 2d at 769 (parent's "general policy statements or guidelines on employment matters is not sufficient evidence to establish centralized control"); *Ennis v. Tyco Int'l Ltd.*, 2004 WL 548796, at *2, *4 (S.D.N.Y. Mar. 18, 2004) (no centralized control despite subsidiary's agreement to parent's employee manual, invitation to contact parent's toll-free line, HR, or legal departments, and common benefit plans); *Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 403-05 (S.D.N.Y. 1999) (plaintiff's receipt of benefits from parent was not probative); *Duffy v. Drake Beam Morin,* 1998 WL 252063, at *4-5 (S.D.N.Y. May 19, 1998) (no centralized control where subsidiary, with separate HR department, decided on hiring, discipline and firing, despite evidence that parent and subsidiary had common benefit plans and that parent's approval was required for significant operational changes); *see also Ritter v. Hill 'N Dale Farm, Inc.*, 1999 WL 569566, at *4 (N.D. Ill. July 28, 1999) (holding that parent's logo

on job application and plaintiff's agreement to abide by rules were insufficient basis for parent liability), *aff'd*, 231 F.3d 1039 (7th Cir. 2000).

The district court sought to justify disregarding such precedent on the ground that no one decision involved precisely the factors present here. SPA17. But all of these decisions, each involving variations on the evidence before the Court here, share a unifying theme: The parent ***must*** exercise day-to-day control over final employment decisions regarding the plaintiff. No fact cited by the district court, or proven at trial, begins to meet that requirement.

### 2. The other factors do not support parent liability.

Turley did not establish interrelated operations between Lackawanna and AMUSA by showing, for example, shared payroll systems, bank accounts, credit lines, phone lines, office space, and employees, and parent involvement in daily production decisions. *Herman v. Blockbuster Entm't Group*, 18 F. Supp. 2d 304, 309 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999); *Woodell*, 357 F. Supp. 2d at 768. Yet the district court found sufficient evidence of interrelated operations based solely on three facts: "the highest position at Lackawanna was the plant supervisor"; financial information was jointly reported; and AMUSA's Board of Managers had authority to indemnify Lackawanna employees represented by AMUSA counsel. SPA18. These facts show "nothing rising to the level of control over regular business decisions contemplated by the single employer doctrine."

30

*Ennis*, 200 WL 548796, at *4. Titles aside, Lackawanna's managers alone controlled the plant's business decisions.

The final two factors, common management and control, "are less important as they represent ordinary aspects of the parent-subsidiary relationship." *Meng*, 73 F. Supp. 2d at 403. "'[T]he mere existence of common management and ownership [is] not sufficient to justify treating a parent corporation and its subsidiary as a single employer'"; nor is evidence of overlapping directors. *Velez*, 244 F.R.D. at 254. Instead, there must be evidence that the parent's corporate officers participated in employment decisions affecting the plaintiff. *Id.*; *Herman*, 18 F. Supp. 2d at 313. Turley introduced no such evidence.

### B. New York Law

To impose liability on AMUSA under the HRL, Turley was obliged to prove that AMUSA had the power to hire, fire, and pay him, and to control his conduct. *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393, 405 (S.D.N.Y. 2008). As discussed above, Turley made no such showing.

\* \* \*

The district court thus erred in refusing to grant judgment to AMUSA on the hostile-environment claims. If the Court vacates the judgment against AMUSA, responsibility for the related punitive award, which was based on AMUSA's

finances, would fall entirely upon Lackawanna. To prevent that miscarriage of justice, a new trial on punitive damages would be required for Lackawanna.

## III. PREJUDICIAL ERROR IN THE JURY CHARGE AND VERDICT FORM REQUIRES A NEW TRIAL.

The jury charge and verdict form provided the jury the wrong legal standard on the pivotal issue of the corporate defendants' liability under Title VII and Section 1981. Both erroneously directed the jury to impose liability if *one* particular supervisor, rather than the employer *as a whole*, failed adequately to respond to harassment perpetrated by Turley's co-workers. Because AMUSA and Lackawanna were severely prejudiced by this error, a new trial is required.

### A. The Charge And Verdict Form Stated The Wrong Standard.

The jury instructions and verdict form incorrectly advised the jury that the corporate defendants would be liable if any *one supervisor* failed to take reasonable action to address co-worker harassment. Charge No. 31 instructed that the employer is liable for a hostile environment created by "nonsupervisory fellow workers" if "the Plaintiff's supervisor or successively higher authority knew … or should have known" of the hostile environment and "permitted it to continue by failing to take remedial action."[4] Similarly, Question 2 of the Phase I Verdict Form asked whether Turley had proven "that a supervisor with immediate or

---

[4] The district judge delivered the instruction both orally and in writing. A936, A937-38.

successively higher authority over the plaintiff created or permitted the hostile or abusive work environment by not taking reasonable action to address it."  A1679.

The jury should instead have been charged that the corporate defendants are liable only if Lackawanna as a whole failed to take appropriate corrective action. As the district court acknowledged, the correct standard is whether the "'***employer*** … fails to take appropriate remedial action.'"  SPA19 (emphasis added).  If one supervisor fails to take corrective action, but other supervisors respond, the employer as a whole has not failed to satisfy its obligations.  This Court has repeatedly enunciated that principle.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (test is whether "***the employer***" "'failed to take appropriate remedial action'") (emphasis added); *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) (liability attaches if "the ***employer's*** response" was unreasonable) (emphasis added); *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (liability attaches if "***employer***" failed to take appropriate remedial action) (emphasis added); *Perry*, 115 F.3d at 153-54 (same; approving charge that company is liable if employer's "management level employees"—plural—failed to respond); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 63 (2d Cir. 1992) (liability attaches if "***employer*** … knew of the harassment but did nothing about it") (emphasis added); *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1104 (2d Cir. 1986) ("***employer*** … has a duty to take reasonable steps" to remedy co-worker harassment) (emphasis added).

33

In defending its instruction, the district court cited only a pattern jury instruction concerning **supervisor** harassment, which is governed by a different standard.[5] SPA29 (citing 3C KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS § 171.22 (5th ed. 2012)). The corresponding pattern charge for **co-worker** harassment directs the jury to consider corrective actions not of "a supervisor" but of the employer's "management level employees" broadly. O'Malley, § 171.23.[6] Pattern instructions aside, the charge and verdict form in this case contravened binding law as described in the district court's own order.

## B. The Error Was Severely Prejudicial.

The inaccurate charge was highly prejudicial: it effectively instructed the jurors that corporate liability was established if any individual defendant failed to respond to the harassment, even if others **did** respond. This problem was not theoretical, but real. Although the jury held the three individual defendants individually liable, the incorrect charge allowed it to impose corporate liability without considering whether the **combined** efforts of those individuals to address

---

[5] In such cases, the employer is liable if a hostile environment was created by a supervisor with immediate or successively higher authority over the employee. *Petrosino*, 385 F.3d at 225. The instruction and verdict form here improperly grafted together that standard with the standard for co-worker harassment.

[6] The "Notes" to Section 171.23 reflect this Circuit's rule that the employer is liable for co-worker harassment only if "the **employer** is responsible for the continued hostility." O'MALLEY, *supra*, § 171.23 Notes (emphasis added) (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

the harassment, together with the undisputed evidence of substantial corrective activities by *other* Lackawanna managers, satisfied the corporate defendants' obligations.[7]  For example, Human Resources Manager Nevin Hope searched for evidence and interviewed 17 employees regarding reported animal noises (A887-91); investigated the toy monkey found tied to Turley's car, including by interviewing 20 employees and reviewing parking lot surveillance videotapes (A876-85); investigated a report that Pelc damaged Turley's chair (A886-87); investigated a report of racial slurs over the radio (A893-905); and re-distributed and read aloud anti-harassment policies to employees (A882-84, A891-93, A905). Shift managers monitored the Pickler, investigated incidents, searched for evidence, painted over graffiti, and removed and condemned an offensive sign. A291, A582, A589, A741-43, A838, A840-41, A888.

By effectively instructing the jury that such evidence was irrelevant as long as *one* manager's response was insufficient, the charge hamstrung the company's legitimate defense that the ***combined*** efforts of its managers to address the harassment were adequate.  *Summa*, 708 F.3d at 124-25 (there were "no grounds" to impute liability to university for football players' conduct given the combined

---

[7]  The jury's rejection of the defendants' affirmative defense that they exercised reasonable care to correct harassment does not negate the prejudice; as the district court acknowledged, that defense carried a different standard of proof.  SPA29.

remedial efforts of head coach, assistant coach, and EEO officer).  Accordingly, a new trial is required.

## IV.   THE COMPENSATORY DAMAGES ARE EXCESSIVE.

The  $1,320,000  in  emotional-distress  damages  are  shockingly  excessive given that Turley adduced no evidence of permanent, debilitating distress and was not fired.  A comparison of the amount of damages here with amounts permitted in this Circuit in cases involving "significant" or even "egregious" distress confirms the excessiveness of the awards.

### A.   The $1,320,000 Award Is Grossly Excessive Given The Absence Of Evidence Of Long-Term Debilitating Distress And The Fact That Turley Was Not Fired From His Job.

#### 1.   There was no evidence of long-term debilitating distress.

The  $1,320,000  award  is  grossly  disproportionate  to  the  severity  and duration of the distress that Turley allegedly suffered.  The evidence showed that Turley's distress as a result of his co-workers' actions had been largely resolved by the time of trial.  Turley was treated by two mental-health professionals for just a few  months  each,  was  prescribed  no  medication  after  November  2008,  and received  no  psychiatric  treatment  after  the  plant  closed  in  April  2009.   A217, A686-89.  Dr. Jaffri stopped treating Turley in 2008 after seeing him three times and testified that, when he met Turley to prepare for trial, Turley told him that he was  coping  and  needed  no  medication.   A685,  A687-89.   At  the  time  of  trial, Turley was receiving *no* psychiatric services or therapy.  A688-89.

The district court erred in stating that Dr. Jaffri, who had not treated Turley in over 3½ years at the time of trial (A687), "opined that Turley would continue to have triggers for the rest of his life." SPA36. Despite being pressed by Turley's counsel for a future diagnosis, Dr. Jaffri testified only that "*[i]n some cases*," a person with PTSD can re-experience symptoms induced by triggers. A685-86 (emphasis added). But the opinion that "some" might experience such triggers is a far cry from evidence that Turley *will* suffer such triggers. This generic testimony was the *only* evidence of future distress.[8]

Absent evidence of long-term distress, even very serious racial harassment does not justify an award of this magnitude. *See, e.g., Abel v. Town Sports Int'l, LLC*, 2012 WL 6720919, at *1, *6, *16 (S.D.N.Y. Dec. 18, 2012); *MacMillan v. Millenium Broadway Hotel*, 83 F. Supp. 2d 546, 559-63 (S.D.N.Y. 2012) (in hostile-environment case where plaintiff was called "the N word all the time," called "boy," and a black voodoo doll was hung by a noose, court reduced jury's $125,000 emotional-distress award to $30,000, given that evidence of distress was "modest" and plaintiff continued working); *see also Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1077-78, 1082-83 (6th Cir. 1999) (upholding $50,000 emotional-

---

[8] The district court's statement to the jury that Turley "is expected to live for another 30.1 years" and that it could consider this fact "in assessing damages in this case" (A987) may have misled the jury into believing that Turley's injuries were permanent.

distress award in hostile-environment case where sole black employee was subjected to "fairly steady stream of racial jokes and slurs," including being called a "n****r," bathroom graffiti that said "kill all n*****rs," and isolation by co-workers); *In re New York State Div. of Human Rights*, 934 N.Y.S.2d 628, 630, 632-33 (App. Div. 2011) (reducing $500,000 emotional-distress award to $50,000 in case of quid-pro-quo and hostile-environment harassment of high-school-aged employee by adult supervisor that included forced intercourse and was "unquestionably reprehensible").

As these cases demonstrate, emotional-distress damages must be in proportion to the ***actual injury*** resulting from the actionable conduct. Notwithstanding the jury's understandable sympathy for Turley, $1,320,000 is wholly disproportionate to his injury.[9]

## 2. Turley was not discriminatorily fired.

The fact that Turley was not discriminatorily discharged, but instead left the plant when it closed in April 2009, confirms that the evidence here does not justify the massive compensatory award. This Court has made clear that—other things being equal—emotional-distress damages should be more limited when the plaintiff was not discriminatorily fired. *See Lore v. City of Syracuse*, 670 F.3d 127

---

[9] Given that Turley's counsel requested between $2,000,000 and $3,000,000 in compensatory damages, and argued that $1,000,000 would be "too little" (A989-90), the jury probably believed that it was being moderate.

38

(2d Cir. 2012).

In *Lore*, the plaintiff introduced evidence that she suffered from tension headaches, insomnia, anxiety, stress, depression, reclusiveness, stomach problems, vomiting, and diarrhea; "'wouldn't talk' to anyone"; "'cried and cried and cried'"; "became reclusive" when she had been "gregarious"; and, at her doctor's insistence, left work to receive treatment for depression. 670 F.3d at 178. The jury awarded her $250,000 in compensatory damages, including $150,000 for emotional distress and $100,000 for reputational harm. *Id.* at 148-49, 179. This Court affirmed the "generous" compensatory damages (*id.* at 179), but it made clear that whether the $150,000 award for emotional-distress damages was excessive was a close question.

The Court emphasized that Lore "***did not lose her job***" and that "[o]ne would not reasonably expect emotional distress on the part of [Lore] … to be on a par with the emotional distress suffered by a person who was discriminatorily fired." *Id.* (emphasis added). On that basis, the Court distinguished *Meacham v. Knolls Atomic Power Laboratory*, 381 F.3d 56 (2d Cir. 2004), *vacated and remanded on other grounds*, 544 U.S. 957 (2005), in which it had upheld emotional-distress damages of up to $175,000 where plaintiffs presented "qualitatively similar" evidence of distress but—unlike Lore and Turley—also were discriminatorily fired. *Lore*, 670 F.3d at 179. The Court noted that it would

39

have ordered a remittitur had defendants not increased Lore's distress by damaging her reputation. *Id.*

*Lore* instructs that a verdict of $150,000 for distress (a mere 11.4% of the award here) is borderline excessive when a plaintiff presents evidence of distress similar to that presented by Lore and was not discriminatorily fired. Applying *Lore*, Judge Freeman recently ordered a remittitur of a $300,000 emotional-distress award in a hostile-environment case in which the plaintiff, a "dark-skinned" Haitian man, had been called "n*****," "black monkey," "f***ing Negro," and "voodoo man with HIV" and was subjected to "physical menacing." *Abel*, 2012 WL 6720919, at *1. Concluding that the jury's award "shocks the judicial conscience," "especially given that Plaintiff's compensable distress does not include any distress arising from his termination," Judge Freeman ordered a remittitur to $100,000. *Id.* at *17-18. It follows from *Lore* and *Abel* that the award here—which is ***almost nine times*** the emotional-distress award deemed "generous" in *Lore* and ***more than 13 times*** the remitted award in *Abel*—cannot stand.

## B. The Award Is An Outlier Even Among Cases Awarding Damages For "Significant" Or "Egregious" Distress.

The district court recognized that courts in this Circuit have identified three categories of emotional distress: garden-variety, significant, and egregious. SPA33-34. Despite acknowledging that "none of [the] cases [cited by Turley]

40

establish precedent for the magnitude of damages, for emotional distress alone, present here," the court allowed the award to stand.  SPA34-35, 37.  That ruling is unsustainable.

### 1. The award is far out of line with those in other cases involving "significant" distress.

The district court held that Turley suffered "significant emotional and physical repercussions" from his co-workers' conduct.  SPA36.  But other plaintiffs who have proven "significant" distress have been awarded a mere fraction of the amount awarded to Turley.  The district court stated that "'[s]ignificant' damages merit awards at least as high as $175,000" (SPA34), but many cases involving "significant" emotional-distress result in awards of $100,000 or less.  *Khan v. Hip Cent. Lab. Servs., Inc.* 2008 WL 4283348, at *6-12 (E.D.N.Y. Sept. 17, 2008) (reducing $200,000 award to $50,000 for "significant" distress, including major depression requiring medication, "death wish," insomnia, and limitation on activities); *Rainone v. Potter,* 388 F. Supp. 2d 120, 124-26 (E.D.N.Y. 2005) (reducing $175,000 award in failure-to-promote case to $50,000 where plaintiff was "completely shattered," took six-month leave, suffered major depression, and saw psychologist regularly for four years); *Bick v. City of New York*, 1998 WL 190283, at *20-27 (S.D.N.Y. Apr. 21, 1998) (reducing award on gender claim from $750,000 to $100,000 where counselor, who treated plaintiff 45 times and was treating her at the time of trial, testified to her humiliation, anxiety

and depression requiring medication, feelings of powerlessness, disrupted sleep, weight gain, suicidal ideation, and at-home intervention); *Perdue v. City Univ. of New York,* 13 F. Supp. 2d 326, 337 (E.D.N.Y. 1998) ($85,000 award upheld in discrimination case where plaintiff was "disgraced, embarrassed, scared" and "experienced significant stress which aggravated a preexisting back condition, causing her to consult with [doctors] and to take pain killers"); *Anderson v. YARP Rest., Inc.,* 1997 WL 27043, at *4, *8 (S.D.N.Y. Jan. 23, 1997) ($65,000 award upheld in sexual-harassment case where plaintiff and therapist testified that plaintiff suffered panic attacks, insomnia, suicidal thoughts, and fear, and inability to maintain employment for three years).

Cases involving awards of $175,000, including the one cited by the district court as representative of "significant" distress cases (SPA34), have involved an unlawful firing or adverse action and/or debilitating distress, neither of which is present in this case. *See, e.g., Meacham*, 381 F.3d at 77 (affirming $175,000 emotional-distress award to plaintiffs who were discriminatorily terminated, testified that they suffered "shock, nightmares, sleeplessness, and other subjective distress," and also established "either physical sequelae [of emotional distress] or professional treatment"); *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 563-64, 575-78 (S.D.N.Y. 2010) (awarding $175,000 to plaintiff who suffered significant insomnia and anxiety requiring medication after a retaliatory

42

investigation that threatened her ability to earn a living and practice her profession entirely **and** a retaliatory firing); *Shea v. Icelandair*, 925 F. Supp. 1014, 1022-24, 1034 (S.D.N.Y. 1996) (reducing $250,000 award to $175,000 where the "most important factor that sets this case apart from others" was that the discriminatory demotion substantially aggravated the plaintiff's Parkinson's and coronary artery disease). In any event, these cases involving "significant" distress hardly can justify Turley's awards, which in combination are almost an order of magnitude greater.

### 2. Even in cases of "egregious" distress, courts have generally awarded *less than half* the damages awarded here.

The district court recognized that "egregious" cases "generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." SPA34 (internal quotes omitted). But even in "egregious" cases, courts have not allowed awards of even **half** the size of the jury's award here.

The decision that the district court cited as involving "egregious" distress affirmed a $500,000 award that had been reduced from over $1,100,000. *Id.* (citing *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 39-41 & n.1 (2d Cir. 1997) ($500,000 award for plaintiff with existing "psychiatric disabilities" who was "rendered permanently non-functional" and "unemployable for life")). In fact, a review of "egregious" cases reveals that $500,000 is at the

43

high end even when a plaintiff suffered permanently debilitating effects, had pre-existing conditions making him or her unusually vulnerable to distress, or both. *See, e.g., Welch v. UPS, Inc.*, 871 F. Supp. 2d 164, 192-97 (E.D.N.Y. 2012) (upholding $200,000 jury award, at the "high end of the spectrum," in disability-retaliation case, where plaintiff suffered "severe emotional distress" exacerbating pre-existing heart condition, causing multi-day hospital admission and "shortness of breath, palpitations, dizziness, chest pain, nausea," and "constant fear" of death); *Caravantes v. 53rd St. Partners, LLC*, 2012 WL 3631276, at *23-24 (S.D.N.Y. Aug. 23, 2012) (in "egregious" case, rejecting claim for $400,000, and awarding $150,000, despite "extensive" discriminatory conduct that led plaintiff to feel "dead on the inside," have "suicidal thoughts," lose interest in sex, and be diagnosed with "severe" Major Depressive Disorder); *McIntyre*, 682 N.Y.S.2d at 168-69 (affirming $600,000 emotional-distress award where doctor testified that terminated plaintiff's distress would make it difficult for her to work in *any* job); *In re Town of Hempstead*, 649 N.Y.S.2d 942, 92-43 (App. Div. 1996) (upholding awards of between $200,000 and $500,000, with largest award for victim of "pervasive and relentless" "extremely lewd" sexual harassment who had been molested as a child); *In re New York City Transit Auth.*, 581 N.Y.S.2d 426, 428-29 (App. Div. 1992) ($450,000 award upheld in "shocking" case where plaintiff with history of miscarriages and infertility was denied pregnancy accommodations and

then suffered miscarriage, causing anguish "to continue for the rest of her life"). The jury's award here was completely out of line with even these "egregious" cases.

### 3. The decision on which the district court principally relied involved a vulnerable child with permanently diminished earning capacity.

The district court principally relied on *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012), for the proposition that a "million-dollar verdict for racial harassment is not *de jure* excessive." SPA37. As the district court itself recognized, however, "[d]ifferences" between *Zeno* and the instant case are "easy to spot." *Id.* In *Zeno*, a bi-racial high-school student endured years of severe racial harassment and bullying. *Zeno*, 702 F.3d at 659-63. The harassment was so severe that it caused him to leave school without a diploma, and instead accept an "IEP" diploma that would not generally be accepted by "employers, the military, four-year colleges, apprenticeship programs, and business or trade schools." *Id.* at 663. The jury awarded $1,250,000 in damages, and the trial court ordered a remittitur to $1,000,000. *Id.*

In affirming the reduced award, this Court distinguished the distress suffered by a teenaged plaintiff as a result of racial harassment in his high school from that of an adult plaintiff in a workplace-discrimination case:

> **[T]he fact is that this is not an employment discrimination case** …
> Anthony was not an adult losing sleep due to workplace stress.

45

> Rather, he was a teenager being subjected—at a vulnerable point in his life—to three-and-a-half years of racist, demeaning, threatening and violent conduct.

*Zeno*, 702 F.3d at 672 (emphasis added). The Court noted with approval that the trial court had "determined that workplace discrimination claims were not analogous to the corrosive effect of condoned discrimination in the schools," relying on guidance from the Department of Education that "[v]erbal harassment of a … child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an adult." *Id.* at 672 n.16. The Court also justified the award on the grounds that the harassment forced the teenager to accept an IEP diploma and that the "jury reasonably could have found [both] that his ability to attend college or enter the workforce was significantly and adversely impaired" and that "the harassment would have a profound and long-term impact on Anthony's life and his ability to earn a living." *Id.* at 672. Based on its review of cases "in the educational context" awarding damages "from the low six figures" to "as much as $1 million," the Court declined to further reduce the $1,000,000 award. *Id.* at 673.

In short, the district court in *Zeno* concluded that $1,250,000 was excessive, and this Court considered $1,000,000 to be the uppermost limit, to compensate a vulnerable child for the profound, long-term impacts of his school's failure to protect him from racial harassment. It follows that damages of $1,320,000 to an

adult, in an employment-discrimination case, who made no claim that he had any diminished earning capacity, are grossly excessive.

* * *

For all of these reasons, this Court should order a substantial remittitur of the compensatory damages.  As defendants argued to the jury, $250,000 is the absolute upper limit for a compensatory award in this case (A993); and, under the evidence and applicable law, an award substantially below that maximum would be more appropriate.

## V.    THE PUNITIVE DAMAGES ARE EXCESSIVE.

If upheld, the $5,000,000 punishment would set a stratospheric new benchmark for punitive damages in employment-discrimination suits in this Circuit.  Given the district court's conclusion that defendants "took … measures meant to counteract the harassment" (SPA9), this case does not warrant a record-shattering sanction.  The punitive damages exceed constitutional and common-law limits and should be dramatically reduced.

### A.    The Punitive Damages Are Unconstitutionally Excessive.

"A legal system has an obligation to ensure" that punitive damages are "fair, reasonable, predictable, and proportionate" (*Payne*, 711 F.3d at 93); yet jurors "hav[e] no objective standards to guide them" in setting such awards (*id.*).  In this case, the jury's $24,000,000 punishment manifestly rested on an entirely arbitrary

47

and improper foundation—the argument by Turley's counsel that punitive damages should be set in reference to AMUSA's total daily sales revenue or net worth. *See* A991-92 (argument by Turley's counsel that "an award of punitive damages of two shifts of [AMUSA's] revenue … equates to 22 million" and that "[f]our percent" of AMUSA's net worth "brings us to 24 million"). These figures had no legitimate relationship to the appropriate punishment for defendants' conduct, but they apparently persuaded the jury to impose a massive sanction.[10]

To ensure against such arbitrary exactions, the Supreme Court has provided three guideposts for identifying an unconstitutionally excessive punishment: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damages to the actual or potential harm to the plaintiff; and (3) the disparity between the punitive award and the civil penalties applicable to comparable conduct. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-76 (1996). Consideration of these

---

[10] Many studies have demonstrated that "salient numbers, such as a plaintiff's request for a specific dollar amount, have a dramatic impact on [mock] jurors' awards" of punitive damages. CASS R. SUNSTEIN ET AL., PUNITIVE DAMAGES: HOW JURIES DECIDE 240 (2003). Recognizing this phenomenon, this Court has "emphasiz[ed] that specifying target amounts for the jury to award is disfavored." *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1016 (2d Cir. 1995), *vacated on other grounds sub nom. Consorti v. Owens-Corning Fiberglas Corp.*, 518 U.S. 1031 (1996). Observing that such suggestions "anchor the jurors' expectations of a fair award at a place set by counsel, rather than by the evidence," it warned that specific proposals "have a real potential to sway the jury unduly." *Id.*

guideposts shows that the punishment here—even as reduced by the district court—is grossly excessive.

1. *Reprehensibility*. "'[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" *State Farm*, 538 U.S. at 419 (quoting *BMW*, 517 U.S. at 575). "[P]unitive damages are intended to punish, and the severity of the punishment, as in the case of criminal punishments, should vary with the degree of reprehensibility of the conduct being punished." *Payne*, 711 F.3d at 101. A large punitive award, such as the $2,000,000 award disapproved in *BMW*, is "tantamount to a severe criminal penalty" and is warranted only for the most egregious misconduct. *BMW*, 517 U.S. at 585.

Here, defendants were punished for failing to take more effective measures to prevent harassment by non-supervisory employees. As the district court recognized, defendants did not "for the most part, perpetrate the racist acts"; instead, according to the court, the jury could have found that their "[i]nvestigations were … perfunctory" and "responses were cursory." SPA40; *see also* SPA21 ("[T]he jury could have reasonably concluded that these measures were either too little, too late, or both."). This passive failure to do more to root out harassment places defendants' conduct at the far low end of the reprehensibility spectrum.

Indeed, none of the hallmarks of particularly reprehensible conduct were present in this case. As the district court acknowledged, defendants engaged in no "'physical assault'" (SPA40 (quoting *State Farm*, 538 U.S. at 426)); and "there is no evidence that Turley was targeted because of financial vulnerability" (*id.*). Nor did the harm result from "malice, trickery, or deceit." *State Farm*, 538 U.S. at 419.

Instead, the district court deemed defendants' conduct reprehensible because the harassment "lasted for more than three years" and supposedly "escalated" while defendants' corrective efforts were inadequate. SPA40. But the district court itself acknowledged that Lackawanna ramped up its remedial efforts when the harassment continued. When the "KKK" graffiti appeared, for example, Lackawanna conducted multiple employee interviews (SPA21);[11] and when Turley found the stuffed monkey on his car, the company questioned employees, reminded each of them of its anti-harassment policies, hired an attorney to conduct an independent investigation, and installed new lights in the parking lot (SPA9, SPA15). The district court denigrated such efforts because defendants did not "find the perpetrator" (SPA21), but that failure does not render defendants' conduct unusually reprehensible—particularly given the acknowledged obstacles to rooting out and punishing the harassers. *See Alfano v. Costello*, 294 F.3d 365,

---

[11] The district court stated that this "incendiary" graffiti remained for "'approximately a month'" (SPA21), but Turley admitted on cross-examination that the graffiti was completely painted over shortly after it appeared (A412-13).

380 (2d Cir. 2002) (noting that incidents of alleged harassment "were difficult for an employer to remedy because they were largely anonymous"); *EEOC v. Xerxes Corp.*, 639 F.3d 658, 675 (4th Cir. 2011) (explaining that the defendant "bore responsibility to investigate its employees' complaints of racial harassment by their coworkers ***and*** an obligation to fairly investigate and only discipline offending coworkers … in a manner consistent with the protections the Union afforded") (emphasis added).[12]

---

[12] In other parts of the opinion, the district court pointed to evidence that Sampsell laughed off certain incidents and that Jaworski repeatedly called Turley "boy." SPA22. Although such conduct (assuming that it occurred) could be considered offensive, it is not sufficiently reprehensible to support a large sanction, especially in light of Lackawanna's other proven efforts to respond to Turley's reports of harassment.

The district court also stated that "[t]he jury could have determined that Defendants hampered police investigations" because Sampsell "insisted on checking with the company's legal department" before turning over certain materials. *Id.*. In fact, when Detective Daniel Cardi investigated Turley's March 2007 report that "an unknown person had cleared away [an] area near [the] restroom wall revealing" the KKK graffiti that had been covered over earlier, Sampsell willingly showed Cardi photographs of the graffiti. A1000. Cardi reported that Sampsell said that he "would check with the legal department" about whether he could provide copies of the photographs (*id.*) and testified that he "never heard a word after that" (A468). Because Cardi neither asked for the photographs again nor took any other steps to investigate the incident, to say that defendants "hampered police investigations" is quite a stretch. Cardi also testified that he did not receive videotapes that he thought might show who had vandalized Turley's car (A456, A462-63), but Cardi admitted that he had no way of knowing whether the area where Turley's car was parked was covered by any video (A470), and the evidence showed that Turley did not park within the camera's range (*see, e.g.*, A420, A422, A697, A709, A754, A777-78, A885). Thus, there is no evidence that the video that Cardi wanted even existed.

51

Both Lackawanna's efforts to end the harassment and the barriers Lackawanna faced in attempting to do so are "significant mitigating factors" that make the "degree of reprehensibility" here "not all that high." *Payne*, 711 F.3d at 101. Even if some punishment is warranted based on these facts, the reprehensibility guidepost shows that a $5,000,000 exaction is "unreasonably high." *Id.* at 102.

2. *Ratio*. The "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW*, 517 U.S. at 580. Given the modest degree of reprehensibility and the size of the compensatory damages, the 3.8:1 ratio of punitive to compensatory damages is too high.

Although ratios of 4:1 or higher can be constitutional when compensatory damages are modest (*State Farm*, 538 U.S. at 425), "[w]hen compensatory damages are substantial, … a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008) (holding that "a 1:1 ratio … is a fair upper limit" on punitive damages in maritime cases). This Court recently explained that the permissible ratio of punitive to compensatory damages is inversely related to the amount of the compensatory damages: For any particular degree of reprehensibility, the permissible ratio decreases as the compensatory

damages increase. *Payne*, 711 F.3d at 102-03. In *Payne*, the Court indicated that a 10:1 ratio might be permissible had the conduct before it caused only $10,000 in compensable harm, while a 1:1 ratio "would be very high" if the compensatory damages had been $300,000. *Id*. at 103. The Court concluded that, "given the substantial amount of the [$60,000] compensatory award," a 5:1 ratio "appears high" (*id.*); ultimately, it ordered a remittitur to $100,000, representing a ratio of 1.67:1 (*id.* at 106).

In this case, given the huge award of compensatory damages, even a 1:1 ratio "would be very high" (*Payne*, 711 F.3d at 103) because it would result in an enormous punishment for conduct that is not extremely reprehensible. Indeed, since *State Farm*, many courts, including this Court, have held that a 1:1 ratio of punitive to compensatory damages, or lower, marks the constitutional maximum even when the compensatory award was far smaller than the compensatory damages here.

In a case involving a retaliatory termination, for example, Judge Marrero reduced a $1,600,000 punitive award to $190,000, an amount equal to the back-pay award. *Thomas v. Istar Fin., Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007). This Court "agree[d]" that the compensatory damages were substantial and concluded that "[t]his factor weighs heavily in favor of a punitive damages award ***equal to or less than*** the remitted compensatory damages award." *Thomas v. Istar Fin., Inc.*,

53

652 F.3d 141, 149 (2d Cir. 2011) (per curiam) (emphasis added).

In another retaliatory-termination case, this Court held that the district court properly reduced the punitive damages from $2,500,000 to $600,000—less than half of the compensatory damages. *Zakre v. Norddeutsche Landesbank Girozentrale*, 344 F. App'x 628, 631 (2d Cir. 2009).

And in a case in which the defendant police officer arrested a woman in retaliation for her rejection of his advance and then, at the police station, "grabbed her throat, slammed her body against the wall, … choked her with such force that she was unable to breathe and began to lose vision," and then "threw her onto the ground and struck her repeatedly," this Court reduced the punitive damages to an amount substantially ***below*** the compensatory damages. *DiSorbo v. Hoy*, 343 F.3d 172, 176-77, 189 (2d Cir. 2003) (ordering remittitur of compensatory award to $250,000 and remittitur of punitive damages from $1,275,000 to $75,000). [13]

---

[13] *See also, e.g.*, *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1206-08 (10th Cir. 2012) (reducing $2,000,000 punitive award to amount equal to the $630,307 compensatory award); *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 441-43 (6th Cir. 2009) (vacating $10,000,000 punitive award that was 1.67 times the compensatory award and remanding with instructions to enter remittitur in an amount not more than compensatory damages); *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 56 (1st Cir. 2009) (reducing $350,000 punitive award to $35,000, which equaled the compensatory damages); *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir. 2007) (reversing punitive award that was 9.5 times the compensatory damages and holding that "[i]n this case where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow"); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 152-53, 157 (6th Cir. 2007) (ordering remittitur of $2,628,600 punitive award

*DiSorbo* is by no means the only case in which a 1:1 ratio was deemed to be the constitutional maximum notwithstanding that the defendant's conduct was highly reprehensible. In *Williams*, for example, the plaintiff's supervisor "regularly swore at him and berated him in front of other employees" and "treated [him] and other black employees with special scorn"; the supervisor and other employees "regularly used racially demeaning language around [the plaintiff]"; "there was a pervasive practice of using a double standard for evaluating and disciplining white and black employees"; "white managers were extended privileges, like travel at company expense, unavailable to black employees"; and "black employees were given shorter breaks than white employees." 378 F.3d at 795, 798. Nevertheless, the Eighth Circuit held that a 1:1 ratio was the most that was permitted under *State Farm* and reduced the punitive award from over $6,000,000 to $600,000—an amount equal to the compensatory damages. *See id.* at 798-99.

The conduct here—which boils down to not doing a better job of preventing peer-on-peer harassment—is far less egregious than the active management-level

---

to no more than $400,000, where compensatory damages were $400,000); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (reducing ratio from 3.7:1 to 1.2:1 where compensatory damages were about $4,000,000); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798-99 (8th Cir. 2004) (reducing $6,063,750 punitive award for harassment to $600,000, an amount equal to the compensatory damages).

misconduct in *Williams*. Accordingly, if a 1:1 ratio was the constitutional maximum in *Williams*, an even lower ratio marks the outer limits of the due process guarantee here. Indeed, because emotional-distress damages are partly "based on a component"—the plaintiff's outrage and humiliation—that is "duplicated in the punitive award" (*State Farm*, 538 U.S. at 425-26), no more than a modest amount of punitive damages would be warranted here if the Court upholds any substantial amount of emotional-distress damages.

3. *Fines for comparable conduct*. The third guidepost assesses the "disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *State Farm*, 538 U.S. at 428 (quoting BMW, 517 U.S. at 575). This guidepost reflects a "deference to legislative judgments concerning the appropriate sanctions for the conduct at issue" (*BMW*, 517 U.S. at 583) and provides notice of possible sanctions to potential violators (*id.* at 584). Here, legislative judgments regarding the appropriate punishment for workplace discrimination demonstrate that a $5,000,000 punishment is grossly excessive.

First, the New York Human Rights Law—which otherwise "prohibits the imposition of punitive damages …. in an employment discrimination action" (*Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 565 (S.D.N.Y. 2008), *aff'd*, 344 F. App'x 628 (2d Cir. 2009))—provides for civil fines and penalties, payable to the State, of up to $50,000 for unlawful acts of

employment discrimination, and up to $100,000 for willful, wanton, or malicious discrimination.  *See* N.Y. Exec. Law § 297(4)(c)(vi).   Second, Title VII caps the combined punitive and compensatory damages that can be awarded for workplace discrimination at $300,000.  *See* 42 U.S.C. § 1981a(b)(3).  Although Section 1981 claims are not subject to this cap, "courts in the Second Circuit have found that the legislative determination to impose a $300,000 cap on compensatory and punitive damages awards under Title VII reflects that this is a suitable amount to support the objectives of deterrence and punishment of discriminatory conduct."  *Tse v. UBS Fin. Servs., Inc*., 568 F. Supp. 2d 274, 317-18 (S.D.N.Y. 2008) (internal quotation marks omitted) (reducing $3,000,000 award of punitive damages under New York City Human Rights Law to $300,000); *see also, e.g., Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d  210, 216, 220-21 (E.D.N.Y. 2007) (stating that "the Title VII cap weighs in favor of a reduction of Plaintiff's punitive damages award" and reducing $1,500,000 punitive award to $551,470); *Thomas*, 508 F. Supp. 2d at 263 ("The federal cap … provides guidance on what is considered an appropriate civil penalty for comparable misconduct.").

Accordingly, this guidepost, like the reprehensibility and ratio guideposts, demonstrates that the punitive damages are unconstitutionally excessive.

### B. The Punitive Damages Are Excessive Under Federal Common Law.

"A federal appellate court is not required to find that the jury's award was so

57

excessive as to violate due process … in order to justify setting the award aside."
*Payne*, 711 F.3d at 97. Even if the award here were constitutional, federal common law, informed by review of "court rulings on the same question in other cases" (*id.* at 104), would compel the conclusion that the $5,000,000 award is unsustainable.

After conducting such a review, Chief Judge Amon recently concluded that "punitive damage awards in the range of $50,000 to $300,000" are the norm in "harassment and discrimination" cases. *Shukla v. Sharma*, 2012 WL 481796, at *16 (E.D.N.Y. Feb. 14, 2012). Confirming that observation, federal district courts in New York consistently reduce punitive awards exceeding $1,000,000 to well below that benchmark in employment cases.[14] In fact, we have found only one single-plaintiff employment case in which a New York federal court sustained a punitive award exceeding $1,000,000. In that case, the court approved a

---

[14] *See, e.g.*, *MacMillan*, 873 F. Supp. 2d at 168-69 (reducing $1,000,000 punitive award to $100,000); *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 603-04 (S.D.N.Y. 2010) (reducing $3,000,000 punitive award to $300); *Tse*, 568 F. Supp. 2d at 317-18 (reducing $3,000,000 punitive award to $300,000); *Zakre*, 541 F. Supp. 2d at 567 (reducing $2,500,000 punitive award to $600,000); *Kauffman,* 509 F. Supp. 2d at 221 (reducing $1,500,000 punitive award to $551,470); *Thomas*, 508 F. Supp. 2d at 264 (reducing $1,600,000 punitive award to $190,000); *Watson v. E.S. Sutton, Inc.*, 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005) (reducing $2,500,000 punitive award to $717,000, which was "approximately 50% of the compensatory damages awarded"), *aff'd*, 225 F. App'x 3 (2d Cir. 2006); *Ortiz-Del Valle v. Nat'l Basketball Ass'n*, 42 F. Supp. 2d 334, 345-47 (S.D.N.Y. 1999) (reducing $7,000,000 punitive award to $250,000).

$1,250,000 punitive award for a six-year pattern of discrimination and retaliation. *See Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228 (S.D.N.Y. 1999). The parties settled thereafter. *See Greenbaum*, Case No. 1:95-cv-03850-S, Dkt. 141 (S.D.N.Y. Dec. 21, 1999).

The highest punishment ever approved by ***this*** Court in a single-plaintiff case appears to have been a $717,000 award that was "half the size of the compensatory damages award." *Watson v. E.S. Sutton, Inc.*, 225 F. App'x 3, 5 (2d Cir. 2006). The next highest punishment appears to have been the $600,000 award affirmed in *Zakre*—which also was half the amount of the compensatory damages. 344 F. App'x at 631.

The $5,000,000 award here would break these records by a wide margin. It is four times the award in *Greenbaum* and nearly seven times the award in *Watson.* And more than the current defendants' rights are at stake, because "an excessive verdict that is allowed to stand establishes a precedent for excessive awards in later cases." *Payne*, 711 F.3d at 94. To avoid the unwarranted inflation of discrimination verdicts in this Circuit, the punitive damages should be reduced to a modest fraction of the compensatory damages.

## C. The Punishment Is Excessive Given Lackawanna's Financial Condition.

The $998,750 punitive award against Lackawanna for the IIED claim also is grossly excessive in light of Lackawanna's financial condition. Punitive damages

should not "result in the financial ruin of the defendant" or "constitute a disproportionately large percentage of a defendant's net worth." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992). Here, Lackawanna has "'show[n] that [its] financial circumstances warrant a limitation" of the punitive awards. *Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) (internal quotation marks omitted).

The evidence established that Lackawanna was a defunct company with a net worth of only $1,132,000. A956, A978, A980. Because a $998,750 punishment would nearly wipe out Lackawanna's entire value, the punishment is excessive and must be reduced. *See Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006) (award that would "result in the financial ruin of the defendant or constitute a disproportionately large percentage of the defendant's net worth" should be reduced) (internal quotation marks omitted); *see also Vasbinder*, 976 F. 2d at 121 (reducing punitive award that "would consume approximately thirty percent of [the defendant's] net worth").

## CONCLUSION

The Court should enter judgment for Lackawanna and Sampsell on Turley's IIED claim and for AMUSA on Turley's hostile-environment claim. The Court should order a new trial on Turley's hostile-environment claim against Lackawanna. At minimum, the Court should reduce both the compensatory and the punitive damages to no more than $250,000 each.

60

Dated:  October 24, 2013

MAYER BROWN LLP

By: s/ Evan M. Tager
Evan M. Tager, Esq.
etager@mayerbrown.com
Miriam R. Nemetz, Esq.
mnemetz@mayerbrown.com
1999 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300

SEYFARTH SHAW LLP

Lynn A. Kappelman
lkappelman@seyfarth.com
Dawn Reddy Solowey
dsolowey@seyfarth.com
World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA 02210-2028
Telephone: (617) 946-4888
Facsimile: (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on October 24, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Evan M. Tager
Evan M. Tager
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006
(202) 263-3000

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,733 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point type for text and footnotes.

Dated:        October 24, 2013

s/Evan M. Tager
Evan M. Tager
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006
(202) 263-3000

63