13-561
*Turley v. ISG Lackawanna, Inc.*

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT

3    August Term, 2013

4    (Argued:  February 26, 2014    Decided:  December 17, 2014)

5    Docket No. 13-561

6    _____

7    Elijah Turley,
8    Plaintiff–Appellee,

9    v.

10   ISG Lackawanna, Inc., ISG Lackawanna, LLC, Mittal Steel USA
11   Lackawanna Inc., Larry D. Sampsell, Gerald C. Marchand, Thomas
12   Jaworski, Mittal Steel USA, Inc. d/b/a/ Arcelor–Mittal USA, Inc., Mittal
13   Steel USA Inc., a/k/a/ ArcelorMittal Steel, Arcelor Mittal Lackawanna, LLC
14   f/k/a/ ISG Lackawanna, LLC,
15   Defendants–Appellants.

16   _____

17   Before:    KATZMANN, *Chief Judge*, SACK, *Circuit Judge*, and RAKOFF,[*]
18              *District Judge*.

19       The defendants appeal from an amended judgment entered in the

20   United States District Court for the Western District of New York (William

21   M. Skretny, *Chief Judge*) on February 5, 2013, arising from employment

22   discrimination and racial harassment claims against them.  We conclude

23   that the district court correctly instructed the jury as to employer liability,

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern
District of New York, sitting by designation.

1    that the jury could find that the plaintiff's direct employer and the parent

2    company constituted a single employer for the purposes of federal and

3    state non-discrimination statutes, that the jury's verdict as to intentional

4    infliction of emotional distress was supported by the evidence, and that

5    the jury's compensatory damages award was proper.  We also conclude,

6    however, that the district court erred in failing to further reduce the

7    punitive damages awards.  The judgment of the district court is therefore:

8          AFFIRMED in part; VACATED and REMANDED in part for a new

9    trial, unless the plaintiff accepts a remittitur of the punitive damages

10   award as described in this opinion and imposed by the district court.

11       RICHARD T. SULLIVAN, Harris
12       Beach PLLC, Buffalo, NY (Ryan J.
13       Mills and Mary C. Fitzgerald, Brown
14       & Kelly LLP, Buffalo, NY, *on the*
15       *brief*), *for Plaintiff–Appellee.*

16       EVAN M. TAGER, Mayer Brown
17       LLP, Washington, DC (Miriam R.
18       Nemetz, Mayer Brown LLP,
19       Washington, DC, and Lynn A.
20       Kappelman and Dawn Reddy
21       Solowey, Seyfarth Shaw LLP, Boston,
22       MA, *on the brief*), *for Defendants–*
23       *Appellants.*

24

25

1    SACK, *Circuit Judge*:

2

3         This is an appeal from an amended judgment of the United States

4    District Court for the Western District of New York (William M. Skretny,

5    *Chief Judge*) filed February 5, 2013, on a multimillion-dollar jury award

6    (reduced by the district court on remittitur) for compensatory and punitive

7    damages for violations of state and federal anti-discrimination statutes,

8    and for intentional infliction of emotional distress under New York law.

9    The case before us on appeal involves a pattern of extreme racial

10   harassment in the workplace.

11        The plaintiff, a longtime steelworker at a plant in Lackawanna, New

12   York, endured an extraordinary and steadily intensifying drumbeat of

13   racial insults, intimidation, and degradation over a period of more than

14   three years.  The demeaning behavior of the plaintiff's tormentors included

15   insults, slurs, evocations of the Ku Klux Klan, statements comparing black

16   men to apes, death threats, and the placement of a noose dangling from

17   the plaintiff's automobile.[1]  Supervisors' meager investigations and nearly

---

[1] We recognize that many of these disturbing acts are not unprecedented.  *See,
e.g.*, *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1135–38 (10th Cir. 2008) (display of
a noose); *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1266–68 (7th Cir. 1991) ("KKK"

1   total lack of action failed to stop the escalating abuse; instead, managers

2   often appeared to condone or even participate in part in the harassment.

3   The experience left the plaintiff psychologically scarred and deflated—

4   injury for which a jury awarded $1.32 million in compensatory damages

5   for the violation of statutes prohibiting a hostile or abusive work

6   environment because of his race and the state tort of intentional infliction

7   of emotional distress.  The jury also assessed $24 million in punitive

8   damages, mostly against the employer and its parent company.  The

9   district court subsequently granted a motion for remittitur as to the

10  punitive damages, which remittitur was accepted by the plaintiff, and

11  reduced the punitive award by $19 million, to $5 million.  The court also

12  awarded the plaintiff substantial attorney's fees and costs.

13      The defendants appeal from this judgment and award.  They do not

14  seriously dispute the gravity of the underlying conduct, but they raise

15  several procedural and substantive objections to the district court's

---

scrawled on walls and black dummy hanging from doorway); *Williams v. N.Y.C.
Housing Auth.*, 154 F. Supp. 2d 820, 824–25 (S.D.N.Y. 2001) (R. Carter, J.)
(discussing in depth the horror associated with seeing a noose displayed in the
workplace).  We are unaware, however, of cases in our Circuit in which the
defendants' behavior combines all of them.

1   findings on liability and to its damages award.  We reject most of these

2   challenges, finding no error in the district court's judgment concerning

3   liability on the common-law and statutory claims or compensatory

4   damages.  We do, however, conclude that the punitive damages award,

5   even after the remittitur in the district court, is excessive in light of the

6   principles set forth in the prior case law of the Supreme Court and of this

7   Circuit.

8         We are required to police closely the size of awards rendered in the

9   trial courts within our Circuit.  In recent opinions, we have addressed at

10  length the individual and social harms associated with excessive awards of

11  compensatory and punitive damages, many of which are relevant to this

12  case.[2]  A jury's assessment of damages based on intangibles such as

13  emotional harm or the need for punishment injects an additional element

14  of the immeasurable and subjective into the proceedings, which trial and

15  appellate courts are expected to oversee with care.  Excessive punitive

16  damages also implicate a defendant's constitutional due process rights

17  insofar as they impose a substantial punishment without the safeguards,

---

[2] *See, e.g., Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 205-11 (2d Cir. 2014); *Payne v. Jones*, 711 F.3d 85, 96-106 (2d Cir. 2013).

1    constitutional or otherwise, that attend criminal proceedings.  Pursuant to

2    these concerns, we scrutinize awards for fairness, consistency,

3    proportionality, and, in the case of punitive damages, constitutionality.

4         After completing that review on the facts in the record before us, we

5    conclude, first, that the jury's award for compensatory damages was

6    permissible in light of the nature of the plaintiff's claims.  Second, we

7    conclude that the punitive damages were excessive.  We will remand to

8    the district court for imposition of a remittitur, requiring a new trial on the

9    issue unless the plaintiff accepts an award to be calculated by the district

10   court.  The resulting damages, which will remain substantial, will be

11   appropriate and sufficient to remedy the plaintiff's injury and to impose

12   civil punishment on the defendants for their misbehavior.

13                           **BACKGROUND**

14        Elijah Turley was hired at the Buffalo-area Lackawanna Steel Plant

15   in 1995, and remained in this job despite intense racial harassment until his

16   employment was terminated when the plant closed its doors in 2009.

17   During the period relevant to this litigation, the Lackawanna plant

18   changed hands several times in a series of mergers and acquisitions that

1   followed the 2003 liquidation of Bethlehem Steel, its longtime owner.  For

2   purposes of this appeal, it is sufficient to note that the plant was owned

3   successively by three Delaware-based corporations (referred to here as "the

4   employer" or "Lackawanna") whose names reflected those of three

5   successive corporate parents (hereinafter "the parent company"; the last of

6   which hereinafter "ArcelorMittal USA").[3]

---

[3] The district court described the series of ownerships as follows:

> Defendant ISG Lackawanna Inc., a wholly-owned subsidiary of
> International Steel Group Inc., purchased the steel galvanizing
> operation at the former Bethlehem Steel Plant in Lackawanna, N.Y.
> in May 2003.  In January 2004, ISG Lackawanna Inc. became ISG
> Lackawanna LLC, a Delaware limited liability company.  In April
> 2005, Mittal Steel Co. purchased International Steel Group, Inc., the
> parent of ISG Lackawanna LLC and shortly thereafter changed the
> name to Mittal Steel USA Inc. In June 2006, Mittal Steel Co. and
> Arcelor merged to create ArcelorMittal Inc.  Shortly thereafter the
> name Mittal Steel USA Inc. was changed to Arcelor Mittal USA Inc.
> ISG Lackawanna LLC was then a wholly-owned subsidiary of
> ArcelorMittal USA Inc. and changed its name to ArcelorMittal
> Lackawanna LLC.

*Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 227–28 (W.D.N.Y. 2011)
(footnote and citations omitted).  These entities will be referred to collectively as
"the corporate defendants."

### *The Pattern of Racial Harassment*

From 1997 onward, Turley worked as a process operator in the

Lackawanna plant's "pickler"[4] department.  Throughout the relevant time-

period, he was the only African-American working regularly on his shift.

Initially, he regarded the environment as pleasant and congenial, where

workers treated each other "like a family."  2 Trial Tr. 199, 201.  But things

deteriorated rapidly in 2005, after Turley filed a grievance alleging that

Thomas Jaworski, the manager in the pickler department, was giving

favorable treatment to white employees.  From that point onward, Turley

testified, life in the pickler "was like hell."  2 Trial Tr. 205.

Throughout the remainder of his employment, Turley's co-workers

frequently subjected him to racist epithets, degrading treatment, and, from

time to time, outright threats.  Co-workers declined to speak to him or

interact with him socially on the job, by, for example, joining him for

lunch.  Jaworski, Turley testified, continually referred to him as "boy." 3

Trial Tr. 4–5.  Another witness estimated that thirty percent of the workers

---

[4] "Pickling" is a process "in which heavy scale on the surface of steel is removed by treating the steel with a hydrochloric acid solution."  Timothy F. Malloy, *The Social Construction of Regulation: Lessons from the War Against Command and Control*, 58 Buff. L. Rev. 267, 325 & n.199 (2010) (citing 62 Fed. Reg. 49,052, 49,053 (Sept. 18, 1997)).

1    in the department referred to Turley as "that [fucking nigger]."[5]  2 Trial Tr.

2    90–91.  Unidentified coworkers broadcast monkey sounds over the plant's

3    intercom system, also using the system to threaten Turley anonymously:

4    "We['re] going to fucking kill you, fucking nigger, we're going to kill your

5    fucking Jewish lawyer too."  3 Trial Tr. 81.

6          Turley's workstation became a stage for repeated intimidation and

7    harassment.  Sometime in December 2005, he arrived at work to find a sign

8    hanging from his workstation, printed with the words "dancing gorilla."

9    Joint Stmt. of the Case ¶ 20(a).  Days later, the initials "KK" were spray-

10    painted on the wall near his workstation, and the phrases "King Kong" and

11    "King Kong lives" appeared on the floor plate that Turley crossed to enter

12    his booth.  *Id.* ¶ 20(b).  In July 2006, someone spray-painted the initials

13    "KKK" on the wall near Turley's workstation; the initials appeared again in

14    2007.  *Id.* ¶ 20(f).  In late 2006, after Turley had filed two harassment

---

[5] Although others did, this witness did not use the words "fucking" and "nigger" at trial, substituting "F'ing" and "N" instead."  2 Trial Tr. 90.  As is our ordinary practice in opinions such as these, we employ the actual words, albeit with distaste, for the purpose of reflecting precisely the facts of the case.  The use of "nigger" "in the context of this opinion," in particular, "serves to describe accurately the severity of the behavior to which [the plaintiff] was subjected . . . and not to trivialize the word's significant—and even unique—power to offend, insult, and belittle."  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 38 n.3 (2d Cir. 2014).

1    complaints with the New York State Division of Human Rights, a face with

2    tears was drawn on the wall in the pickler department.  *Id.* ¶ 20(g).  In

3    2008, a graffiti drawing of an ape-like man was found in a railroad car that

4    had been parked inside the department.

5          Although many employees harassed and threatened Turley, a

6    coworker, Frank Pelc, was responsible for some of the more extreme

7    conduct.  He addressed Turley as "you fucking black bitch," and "you

8    fucking black piece of shit."  3 Trial Tr. 26.  Pelc would make monkey

9    sounds when Turley tried to speak to him.  *Id.*  A worker who replaced

10    Turley at his workstation at shift changes testified that, on a daily basis,

11    the door handles and controls that Turley used would be covered with

12    thick, black motor grease.  When the worker complained about this to co-

13    workers, Pelc said, "It must be that [']boon that's doing it," referring to

14    Turley.  2 Trial Tr. 166.  In May 2006, the same sort of grease was smeared

15    all over Turley's chair in the processor booth.  Once, Pelc told Turley:

16    "[W]hen I see your black nigger ass on the outside, I'm going to fucking

17    shoot you."  3 Trial Tr. 28.  When Turley reported the threat to

18    management, "[t]hey laughed it off."  *Id.*

1    The campaign of racial harassment intensified from 2005 into 2008.

2    In one incident, on December 3, 2007, Turley was told to go check on his

3    car, which had been vandalized several times in the past.  Upon arriving,

4    Turley found, dangling from his side-view mirror, a stuffed toy monkey

5    with a noose around its neck.

6    ***Supervisors' Actions***

7    Because Turley brings this claim against his immediate employer, its

8    corporate parent, and three individually named plant managers, rather

9    than against the persons most directly involved in the daily abuse, his

10   claim depends on the adequacy of the supervisors' response, or on their

11   direct involvement in the harassment.  Among the named defendants,

12   Thomas Jaworski managed the pickler department from May 2003 to

13   January 2007.  Gerald Marchand was the plant's manager of human

14   resources from May 2003 until March 2007.  And Larry Sampsell was the

15   plant manager of labor relations and security during the entire relevant

16   time period.

17   Management was not wholly unresponsive to Turley's complaints.

18   A foreman removed the "dancing gorilla" sign, and managers painted over

1   some graffiti.  After the "dancing gorilla" and "King Kong" incidents,

2   Jaworski stated at a crew meeting that such conduct would not be

3   tolerated.  The situation nonetheless continued to worsen.  Plant managers

4   interviewed employees after many of Turley's complaints.  After the 2007

5   incident with the stuffed monkey, the company hired a lawyer to conduct

6   an investigation.  And defendant Larry Sampsell, the manager of labor

7   relations and security, installed lights in the parking lot.  Sampsell also

8   once arranged for a private investigator to pose as a contractor working in

9   the pickler department in order to gather information, but the plan failed

10  when employees discovered that the investigator was taking photographs.

11      On other occasions, however, supervisors were apparently

12  unresponsive; to the contrary, they appeared to encourage some of the

13  behavior.  For example, a coworker accosted Turley while he was meeting

14  with Sampsell and Marchand, shouting, "Shut up you fucking black

15  crybaby bitch.  Fuck you.  You ain't shit.  You're always crying like a bitch."

16  3 Trial Tr. 32.  Turley testified that Sampsell and Marchand "just stood

17  there," *id.*, and the employee was not disciplined for the verbal assault.  In

18  another incident, another coworker, David Pyanowski, apparently

12

1    attempted to bait Turley into striking him, calling Turley a "black bitch," a

2    "cry baby," and a "black piece of shit," and saying, "Why don't you get your

3    b[l]ack ass out of here.  Get the fuck out of here.  We don't want you here

4    anyway."  3 Trial Tr. 82.  When Turley and a union representative went to

5    report the incident, they found Pyanowski and Sampsell laughing about

6    the confrontation in Sampsell's office.  Pyanowski was not disciplined for

7    his behavior.

8         During the multiyear period in which this harassment took place,

9    only two employees were disciplined for their roles in the abuse.  Frank

10   Pelc was suspended for three days for painting the "King Kong" graffiti in

11   January 2006, and for another two days the following month for

12   threatening to "deal with [Turley] on the outside."  4 Trial Tr. 19.  In 2007,

13   another employee received a five-day suspension for asking, in reference

14   to Turley, "Do I have to work with that black man?"  2 Trial Tr. 110-11.  The

15   defendants have contended that their efforts to root out further culprits

16   were frustrated by a "code of silence" among the workers, 1 Trial Tr. 231,

17   but they have not explained why employees such as Pyanowski went

18   unpunished for hostile acts of which the supervisors were aware.

13

1    Several witnesses testified that management seemed uninterested in

2    addressing the ongoing harassment.  Turley testified that multiple calls to

3    the company's complaint telephone line, "Alertline," met with no response

4    or investigation.  Company managers, including Sampsell, also were

5    unresponsive to the efforts of local police to investigate the continuing

6    course of threats and harassment.  Detective Daniel Cardi testified that he

7    repeatedly asked Sampsell and other plant managers for access to

8    surveillance video and other records of the company's investigations.  Each

9    time, managers told Cardi that they would have to check with the

10   company's legal department, and failed to follow up.

11   Sampsell did, however, begin to monitor Turley closely after the

12   complaints started.  After Turley had filed suit in federal court, Sampsell

13   surreptitiously installed two cameras trained on Turley's workstation.

14   Although Sampsell testified that the cameras were meant to detect the

15   persons responsible for harassing Turley, it is undisputed that he did not

16   inform Turley as to their presence; indeed, he initially denied it.  After the

17   cameras were removed, a spray-painted eyeball appeared on the wall

18   where one of the cameras had been.

1    Sampsell also retained a private investigator to run a background

2    check on Turley.  At trial, Turley's counsel reminded Sampsell that, in an

3    earlier deposition, he had testified that he ran the background check

4    because he was looking for a felony or other offense in Turley's history.

5    Sampsell did not deny saying this, and admitted that his recollection

6    would have been better at the time of the deposition than it was at the time

7    of trial.  The defendants did not object to this exchange, and it therefore

8    became part of the record that the jury could consider.

9            ***Effects on Turley***

10   At trial, the union representative testified that between 2006 and

11   2008, inclusive, Turley, "was losing it."  1 Trial Tr. 191.  Turley's

12   psychologist noted that Turley suffered serious panic attacks and engaged

13   in other abnormal behavior.  The psychologist diagnosed Turley with a

14   short-term adjustment disorder, depression, and a panic disorder.  A

15   psychiatrist further diagnosed him with post-traumatic stress disorder

16   brought on by the workplace harassment.  Several times, Turley had to be

17   taken to the hospital as a result of the threats and harassment he

18   experienced.  He lost thirty pounds.  Turley testified that, at the time of the

15

1    trial, he did not sleep, struggled to relate to his children, did not socialize,

2    and was frequently overcome by memories of his experience.

3         According to the district court:

4         When Turley began work at the steel plant, he enjoyed his job and
5         was a man full of confidence; he possessed a colorful and animated
6         personality.  He came in, as one witness put it, displaying his
7         feathers like a "rooster."  But the unyielding harassment took its
8         toll. And by the time he left, he was broken and dispirited.  The
9         company had, again in the words of this witness, "cut the head off
10        the rooster."

11   *Turley v. ISG Lackawanna, Inc.*, 960 F. Supp. 2d 425, 434–35 (W.D.N.Y. 2013)

12   (internal citations omitted).

13        ***Procedural History***

14        Turley filed charges of discrimination with federal and state

15   authorities in 2005 and 2006.  On December 6, 2006, after exhausting his

16   administrative remedies, Turley, through counsel, instituted this action in

17   the United States District Court for the Western District of New York.  The

18   complaint alleges disparate treatment, retaliation, and the creation of a

19   hostile work environment, in violation of 42 U.S.C. § 1981, Title VII, 42

20   U.S.C. § 2000e *et seq.*, and the New York Human Rights Law, N.Y. Exec.

1   Law § 291 *et seq.*,[6] as well as a common-law claim for intentional infliction

2   of emotional distress.  In 2011, the district court granted partial summary

3   judgment to the defendants as to retaliation and as to most disparate

4   treatment claims, but allowed the plaintiff to proceed on his hostile work

5   environment and emotional distress claims.[7]  *Turley v. ISG Lackawanna,*

6   *Inc.*, 803 F. Supp. 2d 217 (W.D.N.Y. 2011).

---

[6] The principal differences among these three statutes are as follows.  A plaintiff may bring an action against his or her employer under Title VII of the Civil Rights Act of 1964 for, *inter alia*, discriminatory conduct that manifests itself in a hostile working environment.  *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  A racially charged hostile work environment also may give rise to a claim under section 1981, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68–69 (2d Cir. 2000), a Reconstruction-era civil rights statute recognizing the right of all persons to make and enforce contracts on the same terms as white citizens.  42 U.S.C. § 1981.  The substantive standards under these two statutes are similar, but, unlike Title VII, section 1981 permits a plaintiff, under certain circumstances, to sue persons other than employers.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004).  Under New York law, a hostile work environment may give rise to statutory claims against employers and, in some circumstances, against non-employer individuals.  *See Feingold v. New York*, 366 F.3d 138, 158 & n.19 (2d Cir. 2004) (explaining that individuals may be liable for aiding and abetting discriminatory conduct under N.Y. Exec. Law § 296(6)); *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542, 473 N.E.2d 11, 12 (1984) (per curiam) (suggesting that individuals may be subject to suit if they qualify as an "employer" within the meaning of the statute).  Claims under the New York Human Rights Law are "generally governed by the same standards as federal claims under Title VII."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

[7] The court also permitted the plaintiff to maintain his claim that he was given unequal pay because of his race.  *Turley*, 803 F. Supp. 2d at 238.  The district court

1      The trial lasted for three weeks, after which the jury deliberated for

2    less than a full day before reaching a verdict.  They found all defendants

3    liable to Turley for creating a hostile work environment, and Sampsell and

4    Lackawanna liable on the emotional distress claim.  Following a two-day

5    trial on damages, the jury awarded a total of $1,320,000 in compensatory

6    and $24,005,000 in punitive damages against the defendants, broken down

7    by defendant.

8       After trial, the defendants moved under Federal Rules of Civil

9    Procedure 50(b) and 59 for judgment as a matter of law, a new trial, or

10   remittitur of damages, on several grounds.  *Turley v. ISG Lackawanna, Inc.*,

11   960 F. Supp. 2d 425, 433 (W.D.N.Y. 2013).  The district court denied the

12   defendants' motion for judgment as a matter of law, but partially granted

13   the motion for a new trial based on its conclusion that the punitive

14   damages award was excessive.  *Id.* at 450, 456.  The court ordered the new

15   trial unless the plaintiff agreed for the punitive damages award to be

16   reduced to a total of $5 million on remittitur, a figure the district court

17   thought represented "the upper most limit permissible under the law." *Id.*

---

later granted the defendants' motion for judgment as a matter of law on this
claim.

1    at 453–54.  The plaintiff accepted the reduction.  A final breakdown of the

2    awards is as follows:

|  | Compensatory | Punitive |
|---|---|---|
| **Hostile Work Environment** | | |
| Corporate defendants | $1,000,000 | $4,000,000 |
| Sampsell | $25,000 | $0 |
| Marchand | $25,000 | $0 |
| Jaworski | $10,000 | $0 |
| SUBTOTAL | $1,060,000 | $4,000,000 |
| **Intentional Infliction of Emotional Distress** | | |
| ArcelorMittal USA Lackawanna Inc. | $250,000 | $998,750 |
| Sampsell | $10,000 | $1,250 |
| SUBTOTAL | $260,000 | $1,000,000 |
| --- | | |
| **TOTAL** | $1,320,000 | $5,000,000 |

3

4    *See id.* at 456.  The district court also awarded the plaintiff attorney's fees of

5    $437,323.30 and costs of $32,711.42.  *Id.*

6         The defendants appealed.

1    **DISCUSSION**

2    The degree of racial intimidation and ridicule that pervaded Turley's

3    workplace during the relevant period far surpassed any threshold

4    necessary to demonstrate a hostile and abusive work environment.  *See,*

5    *e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).  The defendants do

6    not argue otherwise.

7    Instead, they allege five errors in the verdict and judgment, for

8    which the remedy demanded ranges from a reduction in damages to a

9    new trial.  First, the defendants contend that alleged errors in the jury

10   instructions and verdict form prejudiced their case and warrant a new trial

11   on the statutory harassment claims.  Second, the parent corporation in this

12   case, now named ArcelorMittal USA, Inc., argues that it was not the

13   plaintiff's employer, and should not have been held liable as to those

14   claims.  Third, the defendants argue that, irrespective of whether the

15   alleged conduct constituted racial harassment, it does not meet the strict

16   standard set under New York law for intentional infliction of emotional

17   distress.  Finally, they dispute the size of both the compensatory and

18   punitive damages awards.

1    **I.    Jury Instructions and Verdict Form**

2         We review a claim of error in the district court's jury instructions *de*

3    *novo*, disturbing the district court's judgment "only if the appellant shows

4    that the error was prejudicial in light of the charge as a whole."[8] *Japan*

5    *Airlines Co. v. Port Auth. of N.Y. & N.J.*, 178 F.3d 103, 110 (2d Cir. 1999).  "A

6    jury instruction is erroneous if it misleads the jury as to the correct legal

7    standard or does not adequately inform the jury on the law." *Perry v.*

8    *Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997).  We will not require a

9    new trial "[i]f the instructions, read as a whole, presented the issues to the

10   jury in a fair and evenhanded manner." *Lore v. City of Syracuse*, 670 F.3d

11   127, 156 (2d Cir. 2012).

12        The asserted error in this case concerns the court's instructions on

13   the standard for employer liability in a hostile work environment claim.  It

14   is the plaintiff's burden to establish that the discriminatory conduct may be

15   imputed to the employer.  *See, e.g., Summa v. Hofstra Univ.*, 708 F.3d 115,

16   124 (2d Cir. 2013).  To succeed in that endeavor, the plaintiff can

17   demonstrate that a supervisor used his or her authority "to further the

---

[8] We agree with the defendants that their challenge to the jury instruction and verdict form was properly preserved in the district court.  *See* 14 Trial Tr. 3–4.

1    creation of a discriminatorily abusive working environment," *Perry*, 115

2    F.3d at 153, or that the employer knew or reasonably should have known

3    about harassment by non-supervisory co-workers, "yet failed to take

4    appropriate remedial action,"[9] *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir.

5    2009) (internal quotation marks omitted).  The appropriateness of an

6    employer's remedial action must "be assessed from the totality of the

7    circumstances."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).

8        The defendants contend that the district court's instructions would

9    have led the jury to conduct a different, and legally unsound, inquiry.  The

10   court instructed the jury that when a non-supervisory co-worker creates a

11   hostile work environment, the employer will be liable only if the plaintiff

12   proves that his "supervisor or successively higher authority knew . . . or

13   should have known . . . of the hostile or abusive work environment and

14   permitted it to continue by failing to take remedial action."  13 Trial Tr.

15   121–22.  The defendants argue that this instruction would have allowed

16   the jury to hold the company liable if any *single* supervisor or higher

---

[9] Other avenues are available for imputing harassment to an employer, but they
are not relevant to this appeal.  *See, e.g., Howley v. Town of Stratford*, 217 F.3d 141,
154 (2d Cir. 2000) (noting that harassment may be imputed if the employer failed
to provide an adequate avenue for redress).

1    authority failed to adequately respond, on his own, to the harassment.  If

2    the defendants' interpretation is correct, then this instruction would

3    constitute legal error because the employer's response to harassment must

4    be assessed as a whole and in light of the totality of the circumstances.  *See,*

5    *e.g., Distasio*, 157 F.3d at 65.

6         We conclude, however, that when read in context, it is clear that the

7    instruction does not contain the error that the defendants assert.  In the

8    paragraph immediately following the language in question, the district

9    court explained:

10        [A]n employer's response need only be reasonable under the
11        circumstances. . . .  Whether an employer's response was reasonable
12        has to be assessed from the totality of the circumstances . . . .
13        Factors to be considered in determining whether the response was
14        reasonable include – okay, we're talking about reasonable employer
15        response – the gravity of the harm being inflicted upon the
16        plaintiff, the nature of the employer's response in light of the
17        employer's resources, and the nature of the work environment.   An
18        employer's response to co-worker harassment is not unreasonable
19        simply because it has not been successful in preventing further
20        harassment.

21   Trial Tr. 13:122.  This passage uses the phrase "employer's response" five

22   times, and explicitly states that the jury must consider the totality of the

23   circumstances.  *Id.*  It employs phrases, such as "the employer's resources,"

1    *id.*, that would make little sense unless the jury was being asked to

2    consider the employer's response as a whole.

3        We are not permitted to dissect a jury verdict by combing through a

4    trial court's instructions seeking language that, when isolated from its

5    context, might be or appear to be misleading.  *See, e.g.*, *Lore*, 670 F.3d at 156

6    (noting that a charge must be read "as a whole"); *Clark v. John Lamula*

7    *Investors, Inc.*, 583 F.2d 594, 600–01 (2d Cir. 1978) (similar).  "[A] jury charge

8    should be examined in its entirety, not scrutinized strand-by-strand." *SR*

9    *Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 119 (2d

10   Cir. 2006) (quoting *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 119 (2d

11   Cir. 1999)).  In the case at bar, the jury instruction, when examined as a

12   whole, properly focused the jury's attention on the totality of the

13   employer's response.  The district court therefore did not "provide a

14   misleading impression or inadequate understanding of the law." *Schwartz*

15   *v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) (internal quotation

16   marks omitted).

17       The defendants also contend, with respect to the same issue, that a

18   question on the verdict form was misleading and prejudicial.  A verdict

24

1    form "must be read in conjunction with the judge's charge to the jury."

2    *Vichare v. AMBAC, Inc.*, 106 F.3d 457, 466 (2d Cir. 1996); *Shah v. Pan Am.*

3    *World Svcs., Inc.*, 148 F.3d 84, 96 (2d Cir. 1998), *cert. denied*, 525 U.S. 1142

4    (1999); *accord Lore*, 670 F.3d at 159–60.  Here, the form was ambiguous with

5    respect to whether any one manager's failure to respond adequately could

6    create liability for a hostile work environment.[10]  But, as we have

7    explained, the district court's instructions made clear that the jury was to

8    consider the totality of the employer's response to the harassment.  These

9    instructions thus clarified any ambiguity in the verdict form.

10         Even assuming *arguendo* that the jury instructions and the form had

11   been erroneous, however, we do not think that the errors would have

12   prejudiced the defendants.  Defendants Sampsell, Marchand, and Jaworski

13   undertook most of the several remedial actions in response to Turley's

14   complaints, conducting some investigations, holding a few employee

---

[10] Under the heading "corporate liability," the jury form asked:

> Has the plaintiff proven by a preponderance of the evidence that a
> supervisor with immediate or successively higher authority over
> the plaintiff created or permitted the hostile or abusive work
> environment by not taking reasonable action to address it?

J.A. 1679.  The defendants argue that the form thus suggests that the company
might be held liable if any single "supervisor . . . permitted the hostile or abusive
work environment by not taking reasonable action to address it."  *See id.*

1    meetings, and taking security precautions, such as installing lights in the

2    parking lot.  The jury nonetheless decided that each of these defendants

3    had either actively participated in the harassment or had failed to take

4    adequate measures to stop or remedy it.  We doubt that the presumably

5    reasonable jury could have determined that the relatively meager and

6    ultimately ineffective response efforts from a few other employees would

7    have tipped the balance and led the jury to determine that the response, as

8    a whole, was adequate.[11]

9    **II.    Parent-Subsidiary Liability**

10        The parent company – now, as noted, named ArcelorMittal USA,

11    Inc. – further argues that it cannot be held liable on the plaintiff's

12    harassment claims because it was not the plaintiff's "employer," as that

13    term is understood under the relevant statutes.  We review *de novo* the

14    district court's denial of judgment as a matter of law on this issue,

15    although our review is "bound by the same stern standards" as the district

16    court's.  *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).  We

---

[11] We also note that the jury found that the corporate defendants failed to prove that the company, as a whole, "exercised reasonable care to prevent and correct promptly any racially harassing behavior in the workplace."  J.A. 1684.

1    therefore view all evidence and draw all inferences in favor of the party

2    opposing judgment as a matter of law, *Fabri v. United Techs. Int'l, Inc.*, 387

3    F.3d 109, 119 (2d Cir. 2004) – in this case, the plaintiff.  We will overturn a

4    verdict only if we conclude that there is "such a complete absence of

5    evidence supporting the verdict that the jury's findings could only have

6    been the result of sheer surmise and conjecture, or such an overwhelming

7    amount of evidence in favor of the appellant that reasonable and fair

8    minded [jurors] could not arrive at a verdict against the appellant."

9    *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) (internal quotation

10   marks and brackets omitted).  The record supporting the jury's finding on

11   this issue is not so sparse as to require a reversal.

12        The jury determined that both Lackawanna and its corporate parent

13   were liable on the federal and state harassment claims.[12]  Of course, as a

14   general matter, the law "allows a corporation to organize so as to isolate

15   liabilities among separate entities." *Murray v. Miner*, 74 F.3d 402, 404 (2d

16   Cir. 1996).  Nonetheless:

---

[12] Applying a different standard of parent-subsidiary domination, the jury
concluded that the parent company was not liable on the emotional distress
claim.

1       there is an equally fundamental principle of corporate law,

2       applicable to the parent-subsidiary relationship as well as

3       generally, that the corporate veil may be pierced and the

4       shareholder held liable for the corporation's conduct when,

5       *inter alia*, the corporate form would otherwise be misused to

6       accomplish certain wrongful purposes.

7  *United States v. Bestfoods*, 524 U.S. 51, 62 (1998). In the employment-

8  discrimination context, we may look past the formal separation among

9  corporate affiliates when "extraordinary circumstances" permit treating a

10  parent and a subsidiary as a "single employer" for the purposes of

11  applicable statutes. *Murray*, 74 F.3d at 404; *see generally* 1 *Fletcher Cyclopedia*

12  *of the Law of Corporations* § 43.90 (2014).

13       To determine whether, under Title VII,[13] a parent and subsidiary

14  constitute a single employer, we apply a four-factor test. *See, e.g., Brown v.*

15  *Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). "Under this test, 'a parent

16  and subsidiary cannot be found to represent a single, integrated enterprise

---

[13] As far as we have been able to determine, we have not previously held that the "single employer" test applies to claims under 42 U.S.C. § 1981 as it does to Title VII claims. *Cf. Dewey v. PIT Telecom. Neth. U.S., Inc.*, 83 Fair Empl. Prac. Cases (BNA) 1792 (2d Cir. 1996) (unpublished summary order) (in claim alleging violations of Title VII, the Age Discrimination in Employment Act, and section 1981, applying the "single employer" test under the former two statutes but not the latter); *cf. Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 343–44 (5th Cir. 2005) (assuming without deciding that the single employer test applies to section 1981 cases). The defendants, however, accept that the "single employer" standard applies to the federal claims in this case, and nothing in their submissions suggests that the analysis would be different under another standard.

1   in the absence of evidence of (1) interrelation of operations, (2) centralized

2   control of labor relations, (3) common management, and (4) common

3   ownership or financial control.'" *Id.* (brackets omitted) (quoting *Cook v.*

4   *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)).  Although no

5   one factor controls the analysis,[14] the second, "centralized control of labor

6   relations," is the most significant.  *See Cook*, 69 F.3d at 1240–41.

7       Our case law instructs us to apply the same four-factor inquiry to

8   determine whether two or more entities constitute a "single employer"

9   under the New York Human Rights Law.  *Brown*, 756 F.3d at 226–28.

10  Applying the test under both federal and state statutes serves the stated

11  goal of the New York Court of Appeals "to resolve federal and state

12  employment discrimination claims consistently."[15]  *Aurecchione v. N.Y. State*

---

[14] The third and fourth factors—common management and common ownership—are, in particular, "ordinary aspects of the parent-subsidiary relationship," which often may be of limited use in determining whether to treat two or more corporate affiliates as a single employer. *Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 403 (S.D.N.Y. 1999).

[15] The district court suggested that state courts apply a "slightly different" standard under the Human Rights Law, which focuses on the parent company's ability to hire, fire, pay, and control the conduct of the plaintiff. *Turley*, 960 F. Supp. 2d at 440 (citing *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393, 405 (S.D.N.Y. 2008)).  This approach, which appears in some earlier New York State Appellate Division cases, is drawn from general common-law principles for determining the existence of an employment relationship. *See, e.g., State Div. of*

1   *Div. of Human Rights*, 98 N.Y.2d 21, 25, 771 N.E.2d 231, 233 (2002); *see also*

2   *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (explaining that New York

3   courts rely on federal case law in this area); *Argyle Realty Assocs. v. N.Y.*

4   *State Div. of Human Rights*, 65 A.D.3d 273, 277, 882 N.Y.S.2d 458, 462 (2d

5   Dep't 2009) (adopting the *Cook* test in a related context).

6        The single-employer inquiry is conceptually distinct from other

7   theories of corporate veil-piercing.  *Cf. Truck Drivers Local Union No. 807 v.*

8   *Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991) (making a

9   similar point in the context of labor relations).  For example, under the

10  single-employer test, a plaintiff need not demonstrate unlawful motive or

11  any intent to use the corporate form to avoid contractual obligations.  *See,*

12  *e.g., Lihli Fashions Corp. v. Nat'l Labor Relations Bd.*, 80 F.3d 743, 748 (2d Cir.

13  1996); *Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW*

14  *Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788–89 (7th Cir. 1993).  And the

15  plaintiff need not demonstrate that the parent company exercises "day-to-

---

*Human Rights v. GTE Corp.*, 109 A.D.2d 1082, 1083, 487 N.Y.S.2d 234, 235 (4th
Dep't 1985).  Although we decide that the same standard controls our inquiry
under both the federal and state statutes, we note that the defendants have not
explained how the analysis would be different under this alternative
formulation.  *Cf. Turley*, 960 F. Supp. 2d at 440.

1    day control" over labor relations.  *See Solis v. Loretto-Oswego Residential*

2    *Health Care Facility*, 692 F.3d 65, 76–77 (2d Cir. 2012).  The plaintiff must

3    show only that the corporate parent's involvement "is sufficient and

4    necessary to the total employment process, even absent total control or

5    ultimate authority over hiring decisions."  *Cook*, 69 F.3d at 1241 (internal

6    quotation marks omitted).

7        In this case, there was some evidence that the parent company was

8    directly and necessarily involved in decisions relating to the plaintiff's

9    employment and to the course of harassment.  It negotiated and entered

10    into the collective bargaining agreement with the union, and it was this

11    agreement that governed the plant's response to Turley's complaints.  A

12    2007 harassment training seminar explained that all complaints must be

13    reported to the corporate human resources department, and that any

14    settlement that changes anyone's terms of employment must be approved

15    by the corporate office.  Employees were directed to report harassment to

16    the "Alertline," a nationwide "hotline."  Plant managers repeatedly stated

17    that they were required to check with the corporate legal department in

18    Chicago before providing information to assist police investigations

1    concerning threats against Turley.[16]  And Turley's employment ended

2    when the parent company shut down the Lackawanna plant and sold its

3    assets.

4        This evidence, along with additional facts recounted in the district

5    court's opinion, *see Turley*, 960 F. Supp. 2d at 437–40, provided a sufficient

6    basis for the jury to conclude that the two companies constituted a single

7    employer for the purposes of the federal and state statutory claims.  We do

8    not mean to imply that Lackawanna and its parent company would have

9    constituted a single entity for all purposes.  And, because our review is

10   constrained by the strict standards that govern a motion for judgment as a

11   matter of law, we do not imply that we would have necessarily treated

12   these two entities as a single employer were we sitting as the trier of fact in

13   this case.  But because we find neither a "complete absence of evidence"

14   supporting the jury verdict nor an overwhelming amount of evidence

15   favoring the defendant, *see Gronowski*, 424 F.3d at 292, we will not disturb

16   the jury verdict as to corporate liability.

---

[16] Because the plant did not have its own legal department, the managers seem
necessarily to have been referring to the corporate office when they expressed the
need to check with legal before cooperating with the police investigation.

1    **III.    Intentional Infliction of Emotional Distress**

2        The district court denied the defendants' motion for judgment as a

3    matter of law on the plaintiff's claim for intentional infliction of emotional

4    distress ("IIED").  *Turley*, 960 F. Supp. 2d at 443–45.  The defendants

5    contend that the district court erred by permitting the jury's verdict on that

6    claim to stand.  Our review is *de novo*, within the strict limitations

7    explained above.  *See, e.g., Gronowski*, 424 F.3d at 292.

8        The IIED tort is problematic.  It provides a remedy for the damages

9    that arise out of a defendant engaging in "extreme and outrageous

10   conduct, which so transcends the bounds of decency as to be regarded as

11   atrocious and intolerable in a civilized society."  *Freihofer v. Hearst Corp.*, 65

12   N.Y.2d 135, 143, 480 N.E.2d 349, 355 (1985); *accord* Restatement (Second) of

13   Torts § 46 cmt. d (1965).[17]  To prevail on such a claim, a plaintiff must

---

[17]    Most if not all states recognized some version of the tort.  *See Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 453 N.E.2d 666, 670 (1983) (citing for that proposition *Prosser on Torts* § 12, at 56 n.81 (4th ed. 1971)), *abrogated on other grounds by Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007); *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993) ("Today we become the forty-seventh state to adopt the tort of intentional infliction of emotional distress as set out in § 46(1) of the Restatement (Second) of Torts.").  Its blurry definition and vague outer limits differ somewhat from jurisdiction to jurisdiction.

1    establish that there was "extreme and outrageous conduct," that the

2    conduct was undertaken with "intent to cause, or disregard of a substantial

3    probability of causing, severe emotional distress," and that the conduct did

4    in fact cause severe emotional distress. *Howell v. N.Y. Post Co.*, 81 N.Y.2d

5    115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350 (1993); *accord Conboy v.*

6    *AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001).

7          Then-Chief Judge Kaye, writing for the New York Court of Appeals

8    in *Howell*, explained the court's reasons for reading the IIED tort narrowly:

9          Unlike other intentional torts, intentional infliction of
10         emotional distress does not proscribe specific conduct
11         (*compare, e.g.*, Restatement [Second] of Torts § 18 [battery]; *id.*,
12         § 35 [false imprisonment]), but imposes liability based on
13         after-the-fact judgments about the actor's behavior.
14         Accordingly, the broadly defined standard of liability is both a

---

The tort is sometimes referred to simply as "outrage." *See, e.g., Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1191 (9th Cir.), *cert. denied*, 493 U.S. 812 (1989) (Wyoming law); *Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 892 n.2 (9th Cir. 1988) ("[Appellant] has conceded on appeal that under California and New York law the tort of outrage is not separable from intentional infliction of emotional distress; we accordingly consider outrage and emotional distress as one claim, though they were separately pleaded in the complaint.") Indeed, as the Restatement (Second) of Torts has explained:

> Generally, the case is one in which the recitation of the facts to an
> average member of the community would arouse his resentment
> against the actor, and lead him to exclaim, "Outrageous!"

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (quoting Restatement (Second) of Torts § 46 cmt. d).

1    virtue and a vice. The tort is as limitless as the human
2    capacity for cruelty. The price for this flexibility in redressing
3    utterly reprehensible behavior, however, is a tort that, by its
4    terms, may overlap other areas of the law, with potential
5    liability for conduct that is otherwise lawful. Moreover,
6    unlike other torts, the actor may not have notice of the precise
7    conduct proscribed.

8    *Howell*, 81 N.Y.2d at 122, 612 N.E.2d at 702, 596 N.Y.S.2d at 353 (citation

9    omitted). Chief Judge Kaye went on to note that because of the

10   extraordinary barriers that had therefore been erected by New York courts

11   to recovery under an IIED theory, up until and including the time of the

12   *Howell* opinion – April 5, 1993 – "every one [of the IIED claims considered

13   by this Court] ha[d] failed because the alleged conduct was not sufficiently

14   outrageous." *Id.*, 612 N.E.2d at 702-703, 596 N.Y.S.2d at 353.

15       IIED, although providing relief for plaintiffs upon occasion post-

16   *Howell*, remains a "highly disfavored [tort] under New York law." *Nevin v.*

17   *Citibank, N.A.*, 107 F. Supp. 2d 333, 345–46 (S.D.N.Y. 2000). It "is to be

18   invoked only as a last resort," *McIntyre v. Manhattan Ford, Lincoln-Mercury,*

19   *Inc.*, 256 A.D.2d 269, 270, 682 N.Y.S.2d 167, 169 (1st Dep't 1998), *appeal*

20   *dismissed sua sponte*, 93 N.Y.2d 919, 713 N.E.2d 418, 691 N.Y.S.2d 383, *leave*

21   *denied*, 94 N.Y.2d 753, 722 N.E.2d 507, 700 N.Y.S.2d 42 (1999); *see also*

22   *Abshier v. Sunset Recordings, Inc.*, 14 Civ. 3227, 3914 (CM), 2014 WL 4230124,

1    at *9, 2014 U.S. Dist. LEXIS 119742, at *23 (S.D.N.Y. Aug. 5, 2014) ("highly

2    disfavored"); *Ibraheem v. Wackenhut Servs., Inc.*, 122 Fair Empl. Prac. Cas.

3    (BNA) 1590, 2014 WL 1873393, at *14, 2014 U.S. Dist. LEXIS 64475, at *41

4    (E.D.N.Y. May 9, 2014) ("extremely disfavored"); *Hogan v. J.P. Morgan Chase*

5    *Bank*, 05 Civ. 5342 (JS), 2008 WL 4185875, at *4, 2008 U.S. Dist. LEXIS

6    118373 (E.D.N.Y. Sept. 4, 2008) (same).

7          As recognized in the New York case law, the perils of a generous

8    rendering of IIED include its possible use in an attempt, successful or

9    otherwise, to punish ill-considered but off-hand derogatory remarks; the

10    poorly defined elements of and limitations on the tort; and the apparent

11    prevalence  in daily life, however unfortunate, of excruciatingly insulting

12    speech causing hurt feelings.  Meanwhile, other well-defined torts, such as

13    libel, slander, and (outside New York State) false light invasion of privacy

14    may be available to attack false, harmful speech while typically benefiting

15    from an old – in some cases ancient – history of extensive case-by-case,

16    statutory, and constitutional development.  These torts may therefore

17    provide carefully delineated remedies to address offending and injurious

18    words without the lack of guidance, and the likelihood of untoward

1    invasions of public speech or private conversation, that may arise when

2    IIED claims are not scrupulously limited.

3         Perhaps for these reasons, although the New York Court of Appeals

4    has not set forth detailed guidelines for when the tort may be available, it

5    has cautioned that a claim for IIED may not be sustainable "where the

6    conduct complained of falls well within the ambit of other traditional tort

7    liability." *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58, 373 N.E.2d 1215, 1217

8    (1978).[18]  Other New York courts have applied this *dictum* to exclude

9    claims for intentional infliction where a cause of action for defamation may

10   be asserted on the facts of the case.  *See, e.g.*, *Brancaleone v. Mesagna*, 290

---

[18]   An appellate court half a continent away recently summed up the gap-filling
argument  this way:

> [T]he tort of IIED is a "gap-filler" tort which was created for the
> "limited purpose of allowing recovery in those rare instances in
> which a defendant intentionally inflicts severe emotional distress in
> a manner so unusual that the victim has no other recognized theory
> of redress." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438,
> 447 (Tex. 2004).  The tort's clear purpose is to supplement existing
> forms of recovery by providing a cause of action for egregious
> conduct that might otherwise go unremedied.  The tort of IIED
> simply has no application when the actor intends to invade some
> other legally protected interest, even if emotional distress results.
> Thus, where the gravamen of a complaint is another tort, IIED is
> not available as a cause of action.

*Young v. Krantz*, 434 S.W.3d 335, 344 (Tex. Ct. App. May 28, 2014) (some citations
omitted).

13-561
*Turley v. ISG Lackawanna, Inc.*

1  A.D.2d 467, 736 N.Y.S.2d 685 (2d Dep't 2002); *Herlihy v. Metro. Museum of*

2  *Art*, 214 A.D.2d 250, 633 N.Y.S.2d 106 (1st Dep't 1995); *Butler v. Del. Otsego*

3  *Corp.*, 203 A.D.2d 783, 610 N.Y.S.2d 664 (3d Dep't 1994).

4        More to the point, applying these principles, some New York courts

5  have determined that plaintiffs may not bring claims for IIED when the

6  conduct and injuries alleged give rise to a statutory claim for workplace

7  discrimination.[19] *See McIntyre*, 256 A.D.2d at 270, 682 N.Y.S.2d at 169

8  (finding "no reason to apply" IIED where damages for emotional distress

9  were available under New York Human Rights Law); *Conde v. Yeshiva*

10  *Univ.*, 16 A.D.3d 185, 187, 792 N.Y.S.2d 387, 389 (1st Dep't 2005) (similar);

11  *Baliva v. State Farm Mut. Auto Ins. Co.*, 286 A.D.2d 953, 954, 730 N.Y.S.2d

12  655, 657 (4th Dep't 2001) (similar). *But see Funk v. F & K Supply, Inc.*, 43 F.

13  Supp. 2d 205, 218–20 (N.D.N.Y. 1999) (finding that IIED claims may be

14  brought alongside statutory claims); Martha Chamallas, *Discrimination and*

_____

[19] There are at least two possible rationales for this approach. One would preclude IIED claims on the ground that they would permit an end-run around the New York legislature's prohibition on punitive damages for violations of the state Human Rights Law. *See Silberstein v. Advance Magazine Publishers, Inc.*, 988 F. Supp. 391, 392–94 (S.D.N.Y. 1997). Another would preclude IIED claims in the face of valid statutory or common-law claims based on "the nature of the IIED tort itself" as a tort of last resort, rather than any independent effect wrought by the state statute. *See Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 451 (Tex. 2004) (Hecht, J., concurring).

38

1    *Outrage: The Migration from Civil Rights to Tort Law*, 48 Wm. & Mary L. Rev.

2    2115 (2007) (discussing the view that IIED is a tort of last resort).

3        The problematic nature of an IIED claim creates two difficult issues

4    that have the potential to affect the outcome of this appeal.  The first, were

5    it squarely before us, would require us to decide whether, under New

6    York law, the plaintiff was flatly barred from maintaining a common-law

7    "gap-filler" claim for IIED alongside his statutory claim for workplace

8    discrimination arising out of the same conduct and alleging the same

9    injury.  In order for us, or any other court, to decide the issue, it would, we

10    think, be confronted with a choice between the general perils associated

11    with the invocation of this tort and the substantial effect that ruling out

12    IIED claims might have on the ability of some harassment plaintiffs to

13    recover punitive damages which might otherwise appear to be warranted.

14    The resolution of this question would thus "require value-laden judgments

15    or public policy choices" and might be best addressed by certifying a

16    question to the New York Court of Appeals.  *Nguyen v. Holder*, 743 F.3d

17    311, 316 (2d Cir. 2014).

1    We are spared the necessity of addressing this difficult and

2    consequential question in the present case, however, because the

3    defendants did not argue below that the IIED tort is categorically

4    unavailable in light of the plaintiff's pursuit of statutory remedies to

5    support their motion for judgment as a matter of law.  We therefore

6    consider it to have been forfeited.  *See, e.g.*, *Banco de Seguros del Estado v.*

7    *Mutual Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir. 2003).[20]

8    The defendants principally contend, instead, that the record contains

9    insufficient evidence to hold Sampsell and Lackawanna liable in light of

10   the high hurdles presented by New York's rendition of the tort.  As to this

11   less categorical assertion, we conclude, to the contrary, that even after

12   taking into account the gravity of the misbehavior that must be established

13   before an IIED claim will be available to a plaintiff, there is sufficient

14   evidence in the record in this case to support such a judgment.

---

[20]  To be sure, we may exercise our discretion to entertain a forfeited defense if the contention turns on a pure question of law.  *See, e.g.*, *Magi XXI, Inc. v. Stato dell Citta del Vaticano*, 714 F.3d 714, 724 (2d Cir. 2013).  But we decline to do so here inasmuch as the defendants, even in their arguments to us on appeal, do not clearly ask that we do so, having only briefly and opaquely gestured in this general direction, and in light of the Pandora's box we might open by doing so. *See* Appellant's Br. at 24.

1    Sampsell, the plant's head of security, was the only person the jury

2    found liable on this claim, and his acts, the defendants contend, consisted

3    largely of failing to respond appropriately to reports of harassment.  The

4    defendants argue that this kind of inaction cannot, as a matter of New

5    York law, ever give rise to an IIED claim.  We disagree with the

6    defendants' characterization of the facts and the law.

7    Ordinarily, the failure to respond appropriately to complaints of

8    harassment, on its own, will not be sufficiently egregious – "outrageous" –

9    to amount to intentional infliction of emotional distress under New York

10   law.  *See, e.g., Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 492

11   (S.D.N.Y. 1999); *Gray v. Schenectady City Sch. Dist.*, 86 A.D.3d 771, 773, 927

12   N.Y.S.2d 442, 445 (3d Dep't 2011); *Stallings v. U.S. Elecs., Inc.*, 270 A.D.2d

13   188, 188, 707 N.Y.S.2d 9, 10 (1st Dep't 2000); *Shea v. Cornell Univ.*, 192

14   A.D.2d 857, 858, 596 N.Y.S.2d 502, 504 (3d Dep't 1993).  General

15   bureaucratic unresponsiveness, lethargy, or a failure to understand the

16   gravity of a situation, although objectionable, is rarely if ever considered so

17   beyond the pale as to reach the extreme threshold necessary for an IIED

18   claim.  But, under New York law, an IIED claim does not turn on a

41

1    distinction between action and omission.  The ultimate question remains

2    whether the conduct proven at trial, in light of all the circumstances, was

3    "utterly intolerable in a civilized community." *Gray*, 86 A.D.3d at 773, 927

4    N.Y.S.2d at 445.

5        Sampsell permitted the hate-ridden and menacing environment to

6    persist for more than three years.  On multiple occasions, he ignored, and

7    failed to discipline employees responsible for, harassment of the plaintiff.

8    He blocked the efforts of local police to investigate threats against Turley.

9    Rather than address Turley's complaints, Sampsell set up a hidden camera

10   that, whatever its intended purpose, in fact surveilled Turley while he

11   worked.  Although Sampsell was in charge of security for the plant, he did

12   nothing when, in his presence, Turley was subjected to a vicious barrage of

13   racial slurs.  And when Turley and a witness went to Sampsell's office to

14   report a particularly degrading verbal assault, they found Sampsell with

15   the offending co-worker, laughing; perhaps, the jury could have

16   concluded, as though he were a co-conspirator.

17       In these circumstances, Sampsell's behavior cannot be described as a

18   simple failure to take timely action in response to a harassment complaint.

1    If he failed to respond to one workplace complaint, however shocking the

2    underlying behavior, that might not be sufficiently outrageous to

3    constitute intentional infliction of emotional distress under New York law.

4    Even a sluggish or incompetent response to two, three, or four complaints

5    might not rise to clear the high bar set for this tort in this State.  But

6    Sampsell was a personal witness to the ongoing and severe indignity,

7    humiliation, and torment to which the plaintiff was subjected over a

8    substantial period of time — and he was in a position to do something

9    about it.  Instead, he continuously failed to respond for more than three

10   years, blocking others' efforts to investigate serious threats, and, at times,

11   seeming to encourage further harassment.  On these facts, we see no error

12   in either the jury's verdict, or the district court's decision to uphold the

13   jury's finding that the defendant's conduct was outrageous, shocking, and

14   beyond the bounds of decency so as to constitute tortious behavior.

15        We also decline to disturb the jury's finding that Lackawanna also

16   was liable for the IIED tort.  An employer may be liable for the torts of an

17   employee, provided the relevant behavior fell within the scope of

18   employment.  *See, e.g.*, *Riveillo v. Waldron*, 47 N.Y.2d 297, 302, 391 N.E.2d

1   1278, 1281 (1979).  Because it is usually motivated by something personal,

2   harassment, however egregious, ordinarily does not fall within the scope

3   of employment.  *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756–

4   57 (1998); *Gray*, 86 A.D.3d at 773, 927 N.Y.S.2d at 445.  That is not always

5   the case, however.  *Cf. Higgins v. Metro-N. R.R. Co.*, 318 F.3d 422, 426 (2d

6   Cir. 2003) (stating that "work-related outbursts" giving rise to IIED claim

7   can be imputed, though they were not sufficiently outrageous to pass

8   summary judgment in that case).

9         In this case, Turley's IIED claim was supported by evidence that

10  Sampsell refused to use his position as head of plant security to address

11  the ongoing harassment, punish those responsible, and cooperate with

12  investigating authorities.  These actions and omissions fell within

13  Sampsell's assigned role in the company, and may fairly be imputed to his

14  employer.

15  **IV.  Compensatory Damages**

16        We also reject the defendants' claim that the compensatory damages

17  award exceeded what is permissible.  The "calculation of damages is the

18  province of the jury," *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), and

1    "we will not 'vacate or reduce a jury award merely because we would have

2    granted a lesser amount of damages,'" *Lore v. City of Syracuse*, 670 F.3d 127,

3    177 (2d Cir. 2012) (quoting *Narin v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565,

4    566–67 (2d Cir. 1988)).  We accordingly review a district court's decision on

5    remittitur of compensatory damages for abuse of discretion.[21]  *Id.*

6         This discretion does, however, have its limits.  *Dagnello v. Long Island*

7    *R.R. Co.*, 289 F.2d 797, 806 (2d Cir. 1961).  We have observed repeatedly

8    that juries have wide latitude in setting compensation for damages,

9    stressing that our review is "narrow," considering only "whether the award

10   is so high as to shock the judicial conscience and constitute a denial of

11   justice."  *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (internal quotation

12   marks omitted).  But, when juries grant large compensatory awards for

13   intangible and unquantifiable injuries, such as emotional distress, pain,

14   and suffering, we are required to subject the trial court's discretion to

---

[21] "Under New York law, which is pertinent to the extent that [the plaintiff] was found entitled to recover under the [Human Rights Law], an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'" *Lore*, 670 F.3d at 177 (citation omitted) (quoting N.Y. C.P.L.R. § 5501(c)).  Only that portion of the award allocated to the IIED claim is necessarily an award granted under state law; the harassment award, which did not distinguish between state and federal statutes, could be allocated entirely among Title VII and section 1981.

1   "substantial constraints."  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 205

2   (2d Cir. 2014) (quoting *Payne v. Jones*, 711 F.3d 85, 97-98 (2d Cir. 2013)).

3   Awards for mental and emotional distress are inherently speculative.

4   There is no objective way to assign any particular dollar value to distress.

5   Nonetheless, as we explained in discussing a claim of excessive punitive

6   damages in *Payne*, "a legal system has an obligation to ensure that such

7   awards for intangibles be fair, reasonable, predictable, and proportionate."

8   *Payne*, 711 F.3d at 93.

9        We must ensure proportionality, to control for the inherent

10  randomness of jury decisions concerning appropriate compensation for

11  intangible harm, and to reduce the "burdensome costs on society" of over-

12  extensive damages awards.  *Stampf*, 761 F.3d at 205 (noting that, if

13  appellate courts regularly affirm large damages awards in the name of

14  deference to the jury, "the baseline of reasonableness will be constantly

15  forced upward").

16       The jury in the case at bar awarded Turley $1,320,000 for his past

17  and future emotional distress, mental anguish, inconvenience, and loss of

18  enjoyment of life.  Most of the award was compensation attributed to the

46

1    harassment claim, with $260,000 awarded under the claim for IIED.  The

2    defendants argue that the compensatory award was disproportionately

3    large relative to jury awards in similar cases.  They are correct insofar as

4    there are few recorded cases in which the plaintiff claimed exclusively

5    intangible harms and received a compensatory damages award of quite

6    this magnitude.  For example, in a 2012 case involving a similarly

7    protracted and vicious course of harassment, we upheld an award of $1

8    million, which the district court had reduced from $1.25 million.  *See Zeno*

9    *v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 673 (2d Cir. 2012).  But, as we

10   noted at the outset of the opinion, the case before us appears to be unique,

11   combining years of grotesque psychological abuse leading to a marked

12   decline in Turley's mental health and well-being.  He was hospitalized and

13   diagnosed with, *inter alia*, post-traumatic stress disorder, depression, and

14   panic disorder as a result of the harassment that he suffered.  These

15   injuries were extensive and well documented.  The plaintiff in *Zeno*, by

16   contrast, does not appear to have sought medical attention for his

17   emotional injuries.  *Id.* at 673.

1    Moreover, a compensatory award of this magnitude is not entirely

2    without precedent.  The Sixth Circuit in *Pollard v. E.I. DuPont de Nemours,*

3    *Inc.*, 412 F.3d 657 (6th Cir. 2005), affirmed a judgment granting, among

4    other things, $1.25 million for IIED in a sexual harassment claim mirroring

5    this one in terms of length and severity.   *Id.* at 660-63, 666; *see also Pollard v.*

6    *E.I. DuPont de Nemours, Inc.*, 338 F. Supp. 2d 865, 884 (W.D. Tenn. 2003).

7    Taking inflation into account, the Sixth Circuit's 2005 $1.25 million award

8    exceeds the $1.32 million compensatory damages award in this case.[22]

9    Smaller damages awards in cases dating back ten or more years and

10   involving less severe conduct also support affirming a larger award in this

11   case.  *See, e.g., Phillips v. Bowen*, 278 F.3d 103, 111–12 (2d Cir. 2002)

12   (sustaining $400,000 award for distress after sheriff's deputy was

13   "shunned" by colleagues and mistreated for supporting an opposing

14   candidate for sheriff); *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 247 (D.

15   Conn. 2007) (sustaining award of $500,000 in non-economic damages

16   where retaliatory actions by employer caused extreme stress and poor

---

[22] According to the Bureau of Labor Statistics' Inflation Calculator, $1.25 million in 2005 has the buying power of just over $1.5 million in 2014.  *CPI Inflation Calculator*, United States Department of Labor, http://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 15, 2014).

1    health); *Town of Hempstead v. State Div. Human Rights*, 233 A.D.2d 451, 452,

2    649 N.Y.S.2d 942, 942–43 (2d Dept. 1996) (upholding $500,000 award for

3    pattern of "extremely lewd and offensive conduct" over period of about

4    nine months).

5        We thus acknowledge that the jury's compensatory award tests the

6    boundaries of proportionality and predictability.  But under the

7    exceptional and egregious facts of this case, we conclude that the $1.32

8    million compensatory award was fair and reasonable.  Recognizing also

9    the deference that we owe to the district court, which was "closer to the

10   evidence, and [] therefore in a better position to determine whether a

11   particular award is excessive," *Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d

12   137, 141 (2d Cir. 1998), we will not disturb that award.

13       None of this is to say that it was proper for the jury to consider or

14   award damages on the IIED claim in the first instance under the

15   circumstances presented.  As we have explained, we are not deciding

16   whether New York law allows an IIED claim in the light of the

17   simultaneous pursuit by the plaintiff of statutory causes of action for the

49

1    same or similar injury to the plaintiff because the defendants did not

2    pursue that argument.

3    **V.    Punitive Damages**

4         We agree with the defendants, however, that the punitive damages

5    award exceeds the bounds of reasonableness.  The jury assessed $20

6    million in punitive damages against all of the corporate defendants on the

7    harassment claim, $4 million against Lackawanna on the IIED claim, and

8    $5,000 against Sampsell on the IIED claim.  The district court subsequently

9    granted remittitur, which the plaintiff accepted, reducing the awards to $4

10   million, $998,750, and $1,250, respectively.  We leave intact the award

11   against Sampsell, but will remand the case to the district court for

12   imposition of a remittitur as to the punitive award against the corporate

13   defendants, consistent with the discussion that follows.

14        We are required to review the district court's refusal to grant a more

15   substantial remittitur as to the punitive damages award under federal

16   common law, pursuant to the federal appellate courts' supervisory

17   authority over trial courts.  *Payne*, 711 F.3d at 97, 100.  In such cases, "a

18   degree of excessiveness less extreme than 'grossly excessive'" will support

1  remanding for a new trial or remittitur of damages.[23]  *Id.* at 97.   We

2  exercise relatively stringent control over the size of punitive awards in

3  order to ensure that such damages are "fair, reasonable, predictable, and

4  proportionate," to avoid extensive and burdensome social costs, and to

5  reflect the fact that punitive awards are imposed without the protections of

6  criminal trials.  *Id.* at 93–96; *see also Exxon Shipping Co. v. Baker*, 554 U.S.

7  471, 499 (2008) (noting "the stark unpredictability of punitive awards").

8  Our review pursuant to these supervisory powers is for abuse of discretion

9  in the denial of a reduction, but "the degree of discretion enjoyed by trial

10  courts in these matters is relatively narrow."  *Payne*, 711 F.3d at 100.

11      Large punitive damages awards also implicate constitutional due

12  process principles.  *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 420 (1994);

13  *accord Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436

14  (2001).  "To the extent an award is grossly excessive, it furthers no

15  legitimate purpose and constitutes an arbitrary deprivation of property."

---

[23] Our pre-*Payne* case law explained that we would disturb a punitive damages award only if it "shocks our judicial conscience."  *See, e.g., Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996).  It appears that this standard continues to apply to our review under federal common law, although, in light of the panel's opinion in *Payne*, it may be that the judicial conscience is now "more easily shocked."  *Payne*, 711 F.3d at 97.

1    *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).  We

2    review *de novo* a district court's determination that a punitive damages

3    award is not grossly excessive in violation of the United States

4    Constitution.  *Cooper Indus.*, 592 U.S. at 436; *Payne*, 711 F.3d at 100.

5          Where, as here, the defendant challenges an award on both

6    constitutional and non-constitutional grounds, we conduct our review first

7    under federal common law, asking whether the district court abused its

8    discretion in determining that the punitive damages award was

9    appropriate.  *Cf. Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir.

10   2000) (explaining that constitutional limitations should "come into play

11   only after the assessment [of punitive damages] has been tested against

12   statutory and common-law principles").  If we uphold a punitive damages

13   award, or if we order the award reduced, the resulting figure ultimately

14   must survive constitutional scrutiny.

15         The Supreme Court has articulated three "guideposts" for reviewing

16   punitive damages awards.  They apply irrespective of whether our review

17   is constitutional or supervisory in nature.  *Payne*, 711 F.3d at 101 & n.13.

18   We consider: (1) "the degree of reprehensibility" associated with the

1    defendants' actions; (2) "the disparity between the harm or potential harm

2    suffered" and the size of the punitive award; and (3) the difference

3    between the remedy in this case and the penalties imposed in comparable

4    cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

5          With respect to the first aspect of our review, the district court ably

6    explained the gravity of the defendants' actions:

> 7   The overt racist harassment lasted for more than three years. It did
> 8   not improve with time; it escalated. Investigations were feeble and
> 9   perfunctory; responses were cursory. Defendants exhibited an
> 10  indifference to Turley's health, safety, and general well-being. The
> 11  effect this had on Turley has already been detailed. It is enough to
> 12  note here that it was deleterious and pervasive.

13   *Turley*, 960 F. Supp. 2d at 451. These conclusions, wholly supported by the

14   evidence, are sufficient to support a finding that the conduct at issue was

15   egregious in the extreme. *See State Farm*, 538 U.S. at 419 (setting out

16   criteria for identifying reprehensibility).

17          The disparity between the punitive damages award and the already

18   sizable compensation, however, gives us pause. As a general matter, the

19   four-to-one ratio[24] of punitive to compensatory damages awarded is "close

20   to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425 (citing

---

[24] The ratio between compensatory and punitive damages is 4:1 after the district court's remittitur.

1  *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)).  And where, as

2  here, the compensatory damages award is imprecise because of the nature

3  of the injury and high when compared with similar cases, "a lesser ratio,

4  perhaps only equal to compensatory damages, can reach the outermost

5  limit of the due process guarantee."  *Id.*  The district court's extensive

6  damages judgment here therefore tests these constitutional limits.

7      Constitutional limitations aside, moreover, we are duty-bound to

8  ensure that the award is "fair, reasonable, predictable, and proportionate."

9  *Payne*, 711 F.3d at 93.  Where the compensatory award is particularly high,

10  as the one in this case assuredly was, a four-to-one ratio of punishment to

11  compensation, in our view, serves neither predictability nor

12  proportionality.  As noted, this is particularly so where the underlying

13  compensation is, as it is in this case, for intangible—and therefore

14  immeasurable—emotional damages.  Imposing extensive punitive

15  damages on top of such an award stacks one attempt to monetize highly

16  offensive behavior, which effort is necessarily to some extent visceral,

17  upon another.  *Cf. Baker*, 554 U.S. at 500 (noting the uncertainties associated

18  with punitive damages); Cass R. Sunstein, Daniel Kahneman & David

54

1   Schkade, *Assessing Punitive Damages (with Notes on Cognition and Valuation*

2   *in Law)*, 107 Yale L.J. 2071, 2131–33, 2135 (1998) (explaining that awards for

3   emotional distress suffer from substantial unpredictability, deriving from

4   uncertainties in translating "underlying moral judgments into dollar

5   amounts").  Our commitment to reducing arbitrariness in damages awards,

6   reining in excessiveness, and ensuring some degree of proportionality thus

7   weighs in favor of enforcing a tighter relationship between the harm

8   suffered and the punishment imposed.

9          A lower award also is necessary to bring the punitive damages in

10  this case into alignment with comparable awards in other cases.  Upon

11  reviewing the Second Circuit and New York cases brought to our

12  attention, it appears that punitive awards for workplace discrimination

13  rarely exceed $1.5 million.[25]  *See, e.g., Hill v. Airborne Freight Corp.*, 212 F.

---

[25] The defendants contend that the award should be reduced far more
drastically in light of damages limitations and civil penalties imposed by certain
anti-discrimination statutes.  For example, Title VII caps total recovery, including
punitive damages, at $300,000.  42 U.S.C. § 1981a(b)(3).  The New York Human
Rights Law does not permit the recovery of punitive damages, but permits the
imposition of civil penalties of up to $100,000.  *See* N.Y. Exec. Law § 297(4)(c)(vi),
(9).  Although "a reviewing court engaged in determining whether an award of
punitive damages is excessive should accord substantial deference to legislative
judgments concerning appropriate sanctions for the conduct at issue," *Gore*, 517
U.S. at 583 (internal quotation marks omitted), these examples are not so

1    Supp. 2d 59, 76–77 (E.D.N.Y. 2002) (awarding $1 million, spread across

2    multiple plaintiffs, for discrimination and retaliatory conduct); *Greenbaum*

3    *v. Handelsbanken*, 67 F. Supp. 2d 228, 269–71 (S.D.N.Y. 1999) (Sotomayor, J.)

4    (upholding $1.25 million award in sex discrimination case, noting that the

5    defendants' actions, while malicious and deceitful, were "certainly less

6    reprehensible than the worst imaginable violations"); *McIntyre*, 256 A.D.2d

7    at 271, 682 N.Y.S.2d at 169 (remitting award to $1.5 million in case

8    concerning harassment, retaliatory discharge, and IIED).  A $5 million

9    punitive damages award that is four times higher than the underlying

10   compensation therefore appears to us to be excessive by comparison.

11       Attempting to take all of these factors into account, we conclude that

12   a roughly 2:1 ratio of punitive damages to what, by its nature, is

---

powerful as to require drastic reductions in the punitive damages award.  The
punitive damages in this case were awarded under 42 U.S.C. § 1981, and
Congress has made a considered judgment *not* to cap recovery under that statute.
*See* 42 U.S.C. § 1981a(a)(1) (explaining that the damage limitations provision
apply only to the extent that "the complaining party cannot recover under section
1981 of this title").  We therefore think the cases canvassed above provide a more
apt guide than the statutory caps for gauging the appropriate degree of punitive
damages in this case.  *See Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 271
(S.D.N.Y. 1999) (Sotomayor, J.) (noting that, in light of analogous case law,
applicable statutes, and the defendant's characteristics, it would not be
unreasonable to expect a punitive damages award of $1 million or more for
comparable misconduct).

1    necessarily a largely arbitrary compensatory award, constitutes the

2    maximum allowable in these circumstances.  The district court's failure to

3    impose a remittitur or grant a new trial if the plaintiff would not accept an

4    award in such an amount constituted an abuse of discretion by imposing

5    excessive punitive damages that undermine systemic goals of

6    predictability and proportionality.  *See Payne*, 711 F.3d at 93–100.  Our

7    order with respect to the remittitur applies only to the portion of the

8    punitive damages award assessed against the corporate defendants.  In

9    light of its modest size, the relatively limited award of $1,250 in punitive

10   damages imposed on Sampsell does not, even after taking into account

11   what may well be modest assets of this individual defendant, implicate

12   limitations of a constitutional or non-constitutional nature.

13       Because the defendants also raise a constitutional challenge, we

14   must decide whether a reduced award yielding an approximate 2:1 ratio of

15   punitive to compensatory damages would be so grossly excessive as to fall

16   outside the boundaries of due process.  *See, e.g.*, *State Farm*, 538 U.S. at 417.

17   As we have noted, the Supreme Court has cautioned that, when a

18   compensatory award is particularly high, a 1:1 ratio between

1   compensation and punishment may be the maximum award permitted by

2   the Constitution.  *Id.* at 425.  We do not think that a 1:1 ratio is required in

3   the case at bar, though, in light of the extreme nature of the defendants'

4   conduct.  *Cf. Gore*, 517 U.S. at 575 (explaining that reprehensibility is

5   "[p]erhaps the most important indicium of the reasonableness of a punitive

6   damages award"); *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149-50 (2d Cir.

7   2010) (*per curiam*) (affirming a remittitur requiring an approximately 1.5:1

8   ratio in light of "the moderate level of reprehensibility of [the defendant's]

9   conduct").  We think that in the aggravated circumstances of this case, an

10  approximate 2:1 ratio is both permissible under the Constitution and

11  consistent with the established policies adopted and adhered to by this

12  Court.  We are not called upon to, at least at this time, and do not, decide

13  whether a more sizable punitive award would be constitutionally

14  permissible.

15       We note, finally, a lurking question raised by this appeal; fortunately

16  one we think we can avoid deciding, at least at for the time being.  We are

17  remanding for a further remittitur to be imposed with respect to punitive

18  damages.  Remittiturs are a common procedure used by the courts to, in

1    effect, reduce the amount of a damage award that the court concludes is

2    impermissibly high.[26]  They are, though, rather odd devices designed to

3    accomplish indirectly what the Constitution generally prohibits judges

4    from doing directly – overriding the verdict of a jury despite the Seventh

5    Amendment's guarantee to the plaintiff of a jury trial in civil cases.

6            *Remittitur* is defined as the process by which a court compels a
7            plaintiff to choose between the reduction of an excessive
8            verdict and a new trial.  If the plaintiff rejects the specified
9            reduction in the amount of damages, the court must grant a
10           new trial to avoid depriving the plaintiff of the Seventh
11           Amendment right to a jury trial; the court does not have the
12           option of entering judgment for the reduced amount without
13           the plaintiff's consent.

14    Moore *et al.*, *Moore's Federal Practice* § 59.13[2][g][iii][A], p. 59-82 (3d ed.

15    2013) (footnote omitted).

16          In this appeal, we decide the issue of what we view, in our

17    supervisory function, as excessive punitive damages, concluding with a

---

[26]    This practice goes back to the opinion of Justice Story sitting at circuit in 1822 in *Blunt v. Little*[,  3 F. Cas. 760 C.C.D. Mass. 1822) (No. 1578)].  A number of Supreme Court decisions accepted Justice Story's view uncritically and the power of the court to set remittitur has been uniformly accepted by the lower courts.

11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2815, p. 160 (3d ed. 1993); s*ee also id.* at p. 163 (discussing the opinion by Justice Sutherland in *Dimick v. Schiedt*, 293 U.S. 474 (1935), a case addressing the forbidden practice of additur, which "showed the shaky foundation on which the remittitur practice stands").

1    judgment requiring imposition of a remittitur by the district court.[27]  We

2    leave for another day the question of whether, if we decided that the

3    punitive award was excessive on constitutional grounds, we could or

4    would directly order a reduction in the punitive award rather than using

5    the remittitur procedure.  We think this might well be permissible because,

6    unlike in the usual case of remittitur, we would be concluding that the

7    award was *unconstitutional,* rather than unduly high.  Its

8    unconstitutionality might well give us the ability to directly order a

9    reduction of the award pursuant to the due process guarantees of the Fifth

10   Amendment despite the Seventh Amendment civil jury guarantee.[28]

---

[27] The Circuit may impose remittitur directly, but in this case we choose to leave the precise calculation of punitive damages to the district court's discretion.

[28] The observation in *Moore's Federal Practice*, anchored by its citations to judgments in other Circuits, that "when a court finds that a damages award is excessive as a matter of law because it exceeds due-process limits, a reduction of the award to the constitutional maximum does not interfere with the right to a jury trial, and the court need not offer the plaintiff the option of a new trial," Moore *et al.*, *Moore's Federal Practice* § 59.13[2][g][iii][A], p. 59-83 (3d ed. 2013), seems to us, at first blush, to be persuasive.  We note, though, that at least one panel of this Court in a similar situation nonetheless imposed a remittitur to vindicate a defendant's due process right to reduce an unconstitutionally high punitive award.  *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 125 (2d Cir. 2004) (holding that the punitive damages award was unconstitutionally high, but nonetheless ordering "a new trial on punitive damages unless plaintiffs agree to a reduction, in an amount to be determined by the district court, in their punitive damages").

1    Depending on the remittitur proceedings on remand, this issue may well

2    be or become moot in the case before us.  We therefore do not decide it, at

3    least at this time.

4                                          **CONCLUSION**

5

6            For the foregoing reasons, we VACATE the district court's punitive

7    damages award, and REMAND for imposition of a remittitur ordering a

8    reduced punitive damages award against the corporate defendants or, if

9    the plaintiff does not accept the reduced award, a new trial.  The judgment

10   of the district court is in all other respects AFFIRMED.